WESTERN UNION TELEGRAPH CO. *v.* LENROOT, CHIEF OF CHILDREN'S BUREAU, UNITED STATES DEPARTMENT OF LABOR.

No. 49. Argued November 8, 9, 1944.—Decided January 8, 1945.

*Mr. Francis R. Stark* for petitioner.

*Mr. Douglas B. Maggs,* with whom *Solicitor General Fahy* and *Messrs. Robert L. Stern* and *Archibald Cox* were on the brief, for respondent.

MR. JUSTICE JACKSON delivered the opinion of the Court.

A decree of the District Court in substance restrains the Western Union Telegraph Company from transmitting messages in interstate commerce until for thirty days it has ceased employment of messengers under the age of sixteen years and of certain others between the ages of sixteen and eighteen. This was thought to be required by the Fair Labor Standards Act of 1938. The Circuit Court of Appeals affirmed, and we granted certiorari. 322 U. S. 719.

The Western Union Telegraph Company collects messages in communities of origin and dispatches them by electrical impulses to places of destination where they are distributed. Messengers are employed in both collection and distribution. A little under 12 per cent of the messenger force is under sixteen years of age, and about 0.0033 per cent are from sixteen to eighteen years of age, engaged in the operation of motor vehicles, scooters, and telemotors. These messengers are employed only in localities where the law of the state permits it. It is not denied that both groups are engaged in oppressive child labor as defined by the Federal Act,[1] if it applies. Whether it does so apply is the only issue here.

---

[1] " 'Oppressive child labor' means a condition of employment under which (1) any employee under the age of sixteen years is employed by an employer (other than a parent or a person standing in place of a parent employing his own child or a child in his custody under the age of sixteen years in an occupation other than manufacturing or mining) in any occupation, or (2) any employee between the ages of sixteen and eighteen years is employed by an employer in any occupation which the Chief of the Children's Bureau in the Department of Labor shall find and by order declare to be particularly hazardous for the employment of children between such ages or detrimental to their health or well-being . . ." 29 U. S. C. § 203 (1), June 25, 1938, c. 676, § 3 (1), 52 Stat. 1061.

## I

It is conceded that the Act does not directly prohibit the employment of these messengers, because it contains no prohibition against employment of child labor in conducting interstate commerce.[2] It is conceded, too, that language appropriate directly to forbid this employment was proposed to Congress and twice rejected.

The major events of the recorded legislative history of this Act so far as relevant were as follows: After the President's labor message of May 24, 1937 (House Doc. No. 255, 75th Cong., 1st Sess., p. 2) reminded Congress that "A self-respecting and self-supporting democracy can plead no justification for the existence of child labor," bills carefully drawn to carry out his recommendations were introduced in the Senate by Senator Black and in the House by Representative Connery. These bills expressly and comprehensively prohibited the employment of child labor either in interstate commerce or in production of goods intended for shipment in interstate commerce, as well as prohibiting shipment of goods made by child labor.[3] When the Black bill came to vote in the

---

[2] The Act provides: "After the expiration of one hundred and twenty days from the date of enactment of this Act, no producer, manufacturer, or dealer shall ship or deliver for shipment in commerce any goods produced in an establishment situated in the United States in or about which within thirty days prior to the removal of such goods therefrom any oppressive child labor has been employed . . ." § 12 (a), 29 U. S. C. § 212 (a).

[3] "Sec. 7. It shall be unlawful for any person, directly or indirectly—

"(1) to transport or cause to be transported in interstate commerce, or to aid or assist in transporting, or obtaining transportation in interstate commerce for, or to ship or deliver or sell in interstate

Senate, however, all of its child-labor provisions were stricken, and the provisions of another bill recommended by the Committee on Interstate Commerce were substituted.[4] This prohibited the shipment in interstate com-

---

commerce, or to ship or deliver or sell with knowledge that shipment or delivery or sale thereof in interstate commerce is intended, any unfair goods; or

"(2) to employ under any substandard labor conditions any employee engaged in interstate commerce or in the production of goods intended for transportation or sale in violation of clause (1) of this section." This was the provision in the bill S. 2475 as reported, respectively, by the Senate Committee on Education and Labor, July 6, 1937, and by the House Committee on Labor, August 6, 1937. "Unfair goods" was defined to mean goods produced by any substandard labor condition, and the latter was defined to include child labor. §§ 2 (a) (11) and (15).

[4] This was S. 2226, reported in Sen. Rep. No. 726, 75th Cong., 1st Sess. It was incorporated into the Black bill July 31, 1937, 81 Cong. Rec. 7949–51. It provided: "Sec. 4 [§ 27 in the amended Black bill]. It shall be unlawful for any person who—

"(a) has produced goods, wares, or merchandise in any State or Territory, wholly or in part through the use of child labor, on or after January 1, 1938; or

"(b) has taken delivery of such goods, wares, or merchandise in any State or Territory with notice of their character whether by purchase or on consignment, as commission merchant, agent for forwarding or other purposes, or otherwise,

to transport or cause to be transported, in any manner or by any means whatsoever, or aid or assist in obtaining transportation for or in transporting such goods, wares, or merchandise in interstate or foreign commerce or to sell such goods, wares, or merchandise for shipment in interstate or foreign commerce or with knowledge that shipment thereof in interstate or foreign commerce is intended." Other provisions subjected child-labor-made goods to the laws of the states into which they were shipped regardless of their interstate character, forbade transportation into states in violation of their laws, and forbade shipment in interstate commerce of goods not labelled

merce of goods made by child labor, but it did not prohibit the use of it in carrying on the commerce itself. Thus the Senate deleted a direct prohibition of the employment under question here. But the House, in turn, struck out all of the child labor provisions of the Senate bill and substituted those of the Connery bill,[5] which was a counterpart of the Black bill. This was much amended, but as passed at length it contained a provision forbidding child labor in interstate commerce "in any industry affecting commerce" and a prohibition of shipment of child-labor-made goods.[6] The Senate, however, did not agree to the House bill, but meanwhile had passed as a separate measure its own child-labor bill as recommended by the Interstate Commerce Committee.[7] This did not prohibit child labor in interstate commerce. In this posture the Fair Labor Standards bill went to conference. The Conference Report says that the Committee "adopts the child labor provisions of the House amendment, with one exception. In view of the omission from the conference agreement of the principle of section 6 of the House

---

as to their child-labor character. The bill represented the view that several methods of circumventing *Hammer* v. *Dagenhart* should be tried at the same time, in case any should be held invalid.

[5] See S. 2475 as reported by House Committee on Labor, August 6, 1937, H. R. Rep. 1452, 75th Cong., 1st Sess.

[6] "Sec. 10. (a). No producer, manufacturer, or dealer shall ship or deliver for shipment in commerce any goods produced in an establishment situated in the United States in or about which within 30 days prior to the removal of such goods therefrom any oppressive child labor has been employed . . .

"(b) No employer engaged in commerce in any industry affecting commerce shall employ any employee under any oppressive child-labor condition." 83 Cong. Rec. 7441; passed, *id.* at 7450 (75th Cong., 3d Sess.).

[7] S. 2226, identical with the child-labor provisions previously incorporated by the Senate in the Black bill in lieu of the latter's child-labor provisions. See note 4, *supra.* 81 Cong. Rec. 9320.

amendment, subsection (b) of section 10 of the House amendment has been omitted." [8] The formula covering every employer "in commerce in an industry affecting commerce" had been employed in the wage and hour as well as the child-labor provisions of the House bill, and § 6 conferred on the Secretary of Labor the power to decide whether an industry was one "affecting commerce." With the elimination of this delegation to the Secretary, the formula was changed in the wage and hour provisions, making them apply to "every employee engaged in commerce or in the production of goods for commerce." Instead of making a corresponding change in the child-labor section, the conference committee dropped the whole clause. No reason for this different treatment of the child-labor section was given.

No controversy appears to have arisen on the floor of Congress as to inclusion of a direct prohibition applicable to interstate commerce. On the contrary, the advocates of the different versions passed by the Senate and House seem to have overlooked the fact that one contained the prohibition and the other did not; controversy was chiefly over whether the Act should simply re-enact the method of the 1916 Act, which had been held unconstitutional, or should hedge by including labelling and other remedies which might have a better chance of being upheld, whether state-issued age certificates should be utilized, how much discretion should be vested in the Department of Labor, and whether particular goods only or all goods from a particular establishment should be excluded from commerce.[9] So far as coverage was concerned, all proponents were aware that any of the suggested versions

---

[8] Conference Report, H. R. Rep. No. 2738, 75th Cong., 3d Sess., 32.

[9] See 82 Cong. Rec. 1411–14, 1597–98, 1691–95, 1780–83, 1822; 83 Cong. Rec. 7399–7400.

of legislation would reach only a small fraction of existing child labor,[10] and the chief concern seems to have been

[10] See, *e. g.*, Joint Hearings on Fair Labor Standards, Senate Committee on Labor and House Committee on Education and Labor, 75th Cong., 1st Sess., 382–84; Hearings on Regulation of Child Labor, Senate Committee on Interstate Commerce, 75th Cong., 1st Sess., 60; remarks of Representative Schneider of the House Committee on Education and Labor, 82 Cong. Rec. 1823, 83 Cong. Rec. 7401. The Chief of the Children's Bureau of the Department of Labor presented to the Senate Interstate Commerce Committee figures, based on the 1930 Census, showing the distribution by occupations of child workers between 10 and 15 years:

| Occupation | Number | Per cent |
| --- | --- | --- |
| Agriculture | 469,497 | 70.4 |
| Manufacturing and mechanical industries | 68,266 | 10.2 |
| Trade | 49,615 | 7.4 |
| Domestic and personal service | 46,145 | 7.0 |
| Clerical occupations | 16,803 | 2.5 |
| Transportation | 8,717 | 1.3 |
| Extraction of minerals | 1,184 | 0.2 |
| Other (includes public and professional service, forestry, and fishing) | 6,891 | 1.0 |

Hearings, *supra*, p. 60.

Comparable figures based on the 1940 Census (but for the age group 14–17) are as follows:

| Occupation | Number | Per cent |
| --- | --- | --- |
| Agriculture, forestry, fishing | 459,966 | 54.3 |
| Mining | 2,769 | 0.3 |
| Construction | 10,476 | 1.2 |
| Manufacturing | 104,023 | 12.3 |
| Transportation, communication, and other public utilities | 12,103 | 1.4 |
| Trade | 109,687 | 13.0 |
| Personal services | 109,628 | 13.0 |
| Amusement, recreation, and related services | 13,013 | 1.6 |
| Professional and related services | 12,128 | 1.4 |
| Other | 12,944 | 1.5 |

Pamphlet, *1940 Census Data on Employment and School Attendance of Minors 14 through 17 Years of Age* (Dept. of Labor, Children's Bureau, 1943) 14.

Since agriculture was expressly excluded (and this was true of all

to eliminate child labor in mining and manufacturing industries shipping goods in interstate commerce,[11] which

versions of child-labor legislation reported to the House and Senate), the child labor clearly covered by the "producing goods for commerce" formula was at most 12–15%, and most of the remainder was in occupations clearly not covered by that formula, such as local retailing and service industries. In this light, the omission of the one or two percent in nonproducing interstate commerce industries, even if deliberate, would not have been incongruous.

The following exchange during the Senate Interstate Commerce Committee hearings is also of interest, in view of the Senate's rejection of the Black-Connery child-labor provisions in favor of the Commerce Committee proposal:

"Miss LENROOT. . . . There has been a decided shift in the employment of children between the ages of 14 and 16 years from factories to miscellaneous occupations in trade and service industries, which would not be covered by any of the bills now pending before this committee, and which involve very often employment of children for long hours at very low wages.

The CHAIRMAN. Let me ask you this question right there: Do you think newsboys should be prohibited from working? I propound that question to you because it has been put up to me.

Miss LENROOT. I think under any powers that I can see that Congress has or that it may be construed to have now, it would be very difficult if not impossible to bring newsboys in.

The CHAIRMAN. But do you think they should be prohibited from such employment?

Miss LENROOT. I think if Congress had broad power to legislate on the subject of child labor it would be desirable to work out some standard which would be somewhat different from factory employment.

Senator MINTON. In other words, you think it is improper to use newsboys on the streets to sell newspapers?

Miss LENROOT. Under a certain age, and under certain conditions; yes. I would make the age somewhat lower than the age for factory employment, however."

Hearings, *supra*, p. 43.

[11] Thus Senator Wheeler, one of the authors of the measure adopted by the Senate, said, "We are trying to give you something of a practical nature that can be passed, that will perhaps not go as far as some of us would like to see it go, but something which we can uphold as constitutional, that will affect child labor, stop it, and prevent it ef-

was the most objectionable use of child labor.[12]   This had been the only object of the earlier legislation which had been held unconstitutional; neither the Act of 1916,[13] held unconstitutional in *Hammer* v. *Dagenhart,* 247 U. S. 251, nor the Act of 1919,[14] held unconstitutional in *Bailey* v. *Drexel Furniture Co.,* 259 U. S. 20, had prohibited child labor in interstate commerce, but both applied only to child labor in mines, quarries, mills, canneries, workshops, factories, and manufacturing establishments.

Both parties contend on the basis of legislative history that the omission of a direct prohibition was deliberate; the Company arguing that it was unwanted, the Government that it was believed superfluous.   We think that dis-

---

fectively in the factories, particularly in the sweatshops and southern textile mills." "We want to keep them out of the factories where they are being exploited and are in competition with men and in competition with women who need work."   Joint Hearings, *supra,* note 10, pp. 33– 34, 36.   Representative Schneider, who was apparently in charge of the child-labor provisions of the Labor Committee's bill on the floor, reminded the members that although the bill went as far as it could, "the child labor that is used *in the production of articles for interstate commerce* constitutes only 25 percent of nonagricultural child labor that exists today," and hence ratification of the child-labor amendment was still essential.   82 Cong. Rec. 1823 (italics supplied).   And Senator Thomas, who was one of the Senate managers in the conference which produced the final bill, interpreted the result of the compromise as follows in his report to the Senate: "Neither House nor Senate yielded its convictions, but both Houses obtained their common objective, which was to abolish traffic in interstate commerce in the products of child labor and in the products of underpaid and overworked labor." 83 Cong. Rec. 9163.

[12] See generally the hearings preceding the enactment of the Child Labor Act of 1916.   Hearings on H. R. 8234, House Committee on Labor, 64th Cong., 1st Sess.; Hearings on H. R. 8234, Senate Committee on Interstate Commerce, 64th Cong., 1st Sess.

[13] Act of Sept. 1, 1916, c. 432, § 1, 39 Stat. 675.

[14] Act of Feb. 24, 1919, c. 18, § 1200, 40 Stat. 1057, 1138.

passionate reading will not disclose what either advocate sees in this history.

It is nowhere stated that Congress did, and no reason is stated or is obvious why Congress should, purposely leave untouched child labor employed directly in interstate commerce. It is true that no opponent of child labor appeared to want to strike at all of it. Agriculture, which accounts for from one-half to two-thirds of it, was expressly exempted. Child actors, almost negligible in number, were exempted. Telegraph messengers, so far as the evidence reveals, although a familiar form of child labor, were in no one's mind in connection with this prohibition, although the peculiarities of that service were recognized in allowing them under certain conditions to be employed at lower than minimum wages under the Act.[15] But whether a majority of Congress, had this question come to its attention, would have regarded messenger service as more like agriculture in being a relatively inoffensive type of child labor or as more like mining and manufacturing, considered more harmful, is a question on which we have no information whatever.

On the other hand, we find nothing to sustain the Government's position that "the omission resulted from the realization that the indirect sanction of forbidding interstate shipment, coupled with broad statutory definitions" would be construed to eliminate child labor from interstate commerce. No such realization appears in any com-

---

[15] "The Administrator, . . . shall by regulations or by orders provide for (1) the employment of learners, of apprentices, and of messengers employed exclusively in delivering letters and messages, . . . at such wages lower than the minimum wage applicable under section 6 and subject to such limitations as to time, number, proportion, and length of service as the Administrator shall prescribe . . ." § 14, 29 U. S. C. § 214.

mittee report, in the speech of any sponsor of the bills, nor in debate either on the part of those supporting or of those opposing the bills. The only explanation advanced for the hypothesis that Congress deliberately chose indirection instead of forthright prohibition is an assumption that there were doubts of its constitutional power to enact direct legislation. It is true that in *Hammer* v. *Dagenhart*, 247 U. S. 251, this Court had held that an earlier attempt to exclude from interstate commerce products of mines and mills that employed child labor was an invalid attempt to reach employment matters within the control of the states. But even the prevailing opinion in that case expressly conceded that Congress had ample power to control the means by which interstate commerce is carried on. 247 U. S. at 272. There was never a holding or an intimation in this or any other decision of this Court that a direct prohibition of child labor in interstate commerce would not be sustained. Restrictive interpretation in this field reached its maximum in *Hammer* v. *Dagenhart*. It was decided by a closely divided Court and at the time this bill was pending it was undermined by later decisions and was thought to be marked, even then, for consignment to the limbo of overruled cases, a prediction that was shortly fulfilled. *United States* v. *Darby*, 312 U. S. 100. Moreover, the purpose of the proponents of this Act to challenge the decision in *Hammer* v. *Dagenhart* and require this Court to re-examine its soundness is manifest in many ways. It can hardly be supposed that Congress, while reasserting a power once denied to it, feared to exercise directly a power often conceded and never denied.

Our search of legislative history yields nothing to support the Company's contention that Congress did not want to reach such child labor as we have here. And it yields no more to support the Government's contention that Congress wanted to forego direct prohibition in favor of

indirect sanctions. Indeed, we are unable to say that elimination of the direct prohibitions from the final form of the bill was purposeful at all or that it did not happen from sheer inadvertence, due to concentration on more vital and controversial aspects of the legislation. The most that we can make of it is that no definite policy either way appears in reference to such an employment as we have in this case, no legislative intent is manifest as to the facts of this case which we should strain to effectuate by interpretation. Of course, if by fair construction the indirect sanctions of the Act apply to this employment, courts may not refuse to enforce them merely because we cannot understand why a simpler and more direct method was not used. But we take the Act as Congress gave it to us, without attempting to conform it to any notions of what Congress would have done if the circumstances of this case had been put before it.

## II

The Government brought this action to reach indirectly child labor in interstate commerce by bringing it under the prohibition of § 12 (a) of the Act, which so far as material reads "no producer, manufacturer, or dealer shall ship or deliver for shipment in commerce any goods produced in an establishment situated in the United States in or about which within thirty days prior to the removal of such goods therefrom any oppressive child labor has been employed." Violation of this command is a crime (§§ 15 and 16) punishable by a fine and imprisonment, and threatened violations may be restrained by injunction. The Government in this case sought injunction. Its complaint charges the Western Union with a violation in that "defendant has been engaged in shipping telegraph messages in interstate commerce and in delivering telegraph messages for shipment in interstate commerce, the said goods having been produced in its said establishments in

or about which the aforesaid minors were employed, suffered, and permitted to work within thirty (30) days prior to the removal of said goods therefrom."

Contention that this section is applicable to the Western Union is predicated on three steps, viz.: telegrams are "goods" within its meaning; the Company "produces" these goods within the Act because it "handles" them; and transmission is "shipment" within its terms. If it can maintain all three of these positions, the Government is entitled to an injunction; if it fails in any one, admittedly the effort to bring the employment under the Act must fail.

The Government says messages are "goods" because the Act defines "goods" as therein used to include among other things "articles or subjects of commerce of any character." § 3 (i). Of course, statutory definitions of terms used therein prevail over colloquial meanings. *Fox v. Standard Oil Co.*, 294 U. S. 87, 95. It was long ago settled that telegraph lines when extending through different states are instruments of commerce and messages passing over them are a part of commerce itself. *Western Union Telegraph Co. v. James,* 162 U. S. 650, 654. That "ideas, wishes, orders, and intelligence" are "subjects" of the interstate commerce in which telegraph companies engage has also been held. *Western Union Tel. Co. v. Pendleton,* 122 U. S. 347, 356; cf. *Associated Press v. Labor Board,* 301 U. S. 103, 128. It is unnecessary to decide whether electric impulses into which the words of the message are transformed are "goods" within the Act (cf. *Utah Power & Light Co. v. Pfost,* 286 U. S. 165; *Fisher's Blend Station v. State Tax Commission,* 297 U. S. 650; *Electric Bond & Share Co. v. Securities & Exchange Commission,* 303 U. S. 419), since the complaint is not based on "shipment" of impulses as "goods" but only of messages. We think telegraphic messages are clearly "subjects of com-

merce" and hence that they are "goods" under this Act, as alleged in the complaint.

The next inquiry is whether the Western Union Telegraph Company is a producer of these goods within the Act. Congress has laid down a definition that as used in the Act " 'produced' means produced, manufactured, mined, handled, or in any other manner worked on . . ." § 3 (j). The Company, says the Government, not only "handles" the message but "works on" it.

The Government contends that in defining "produced" the statute intends "handled" or "worked on" to mean not only handling or working on in relation to producing or making an article ready to enter interstate transit, but also includes the handling or working on which accomplishes the interstate transit or movement in commerce itself. If this construction is adopted, every transporter, transmitter, or mover in interstate commerce is a "producer" of any goods he carries. But the statute, while defining "produced" to mean "handled" or "worked on" has not defined "handled" or "worked on." These are terms of ordinary speech and mean what they mean in ordinary intercourse in this context. They serve a useful purpose when read to relate to all steps, whether manufacture or not, which lead to readiness for putting goods into the stream of commerce. One who packages a product, or bottles a liquid, or labels, or performs any number of tasks incidental to preparing for shipment might otherwise escape the Act, for in a sense he neither manufactures, produces, or mines the goods. We are clear that "handled" or "worked on" includes every kind of incidental operation preparatory to putting goods into the stream of commerce.

If we go beyond this and assume that handling for transit purposes is handling in production, we encounter results which we think Congress could not have intended.

The definitions of this Act apply to the wage and hour provisions, as well as to the child labor provisions. Section 15 (a) makes it unlawful to transport or ship goods in the production of which any employee was employed in violation of the wage and hour provisions. But it makes this exception: "except that no provision of this Act shall impose any liability upon any common carrier for the transportation in commerce in the regular course of its business of any goods *not produced by such common carrier.*" (Italics supplied.) This recognizes a distinction between handling in transportation and producing, which is entirely put to naught by the Government's contention that by definition everyone who handles goods in carriage is thereby made a producer. The exception then is as if it read "the Act shall impose no liability on a common carrier for carrying goods that it does not carry." One would not readily impute such an absurdity to Congress; nor can we assume, contrary to the statute, that "produced" means one thing in one section and something else in another. To construe those words to mean that handling in carriage or transmission in commerce makes one a producer makes one of these results inevitable. Congress, we think, did not intend to obliterate all distinction between production and transportation. Its artificial definition, if construed to mean that "handling" and "worked on" catches up into the category of production every step in putting the subject of commerce in a state to enter commerce, is a sensible and useful one, not at odds with any other section of the Act. We think the Government has not established its contention that the Western Union is a "producer" of telegraph messages.

A third inquiry remains. Has the Company engaged in "shipping telegraph messages in interstate commerce and in delivering telegraph messages for shipment" as alleged? The learned trial court said, "More troublesome

is the question whether the defendant 'shipped' goods in commerce." But he concluded on the basis of our decisions that the defendant was a "carrier of messages" to be compared to a railroad as a "carrier of goods," citing *Telegraph Co.* v. *Texas*, 105 U. S. 460, 464, *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.*, 96 U. S. 1. He thought "ship" synonymous with "transport" and "convey" and hence held that the Company was "shipping" messages.

The Circuit Court of Appeals, although it sustained the injunction, took a contrary view of the nature of the enterprise. It analyzed the technology of transmitting messages. The message, it said, never leaves the originating office. It is only a text for sending electrical impulses "which are not only not the sender's message, but would be totally incomprehensible to him or to the addressee, if either could perceive them." It said, "From the foregoing it is at once apparent that there is not the least similarity between what the defendant does and the transportation of goods by a common carrier. Thus it cut the ground from under the Government's only allegation of violation: i. e., that the Company is engaged in "shipping" messages. It advanced this theory, apparently, to answer the Company's contention that if it was likened to a carrier, as the District Court thought, it was entitled to the benefit of the carrier's exemption in § 15 (a) (1). We do not think it is necessary for us to resolve the interesting but baffling inquiry as to precisely what, if anything, moves across state lines in the telegraphic process. In its practical aspects, which concern the public, transmission of messages is too well known to require analysis; and in its scientific aspects, which interest the physicist, it is too little known to permit of it.

The statute applies the indirect sanctions of the Act only to those who "ship" subjects of commerce. It does not, however, define "ship." The Government says, "The

verb 'ship' is an imprecise word meaning little more than to send or to transport." The term, not being artificially defined by statute, is from the ordinary speech of people. Its imprecision to linguists and scholars may be conceded. But if it is common in the courts, the market places or the schools of the country to speak of shipping a telegram or receiving a shipment of telegrams, we do not know of it, nor are examples of such usage called to our attention. Nor, if one departs from the complaint in the case and adopts the theory of the Court of Appeals, do we think either scientist or layman would ever speak of "shipping" electrical impulses. The fact is that to sustain the complaint we must supply an artificial definition of "ship," one which Congress had power to enact, but did not. We do not think "ship" in this Act applies to intangible messages, which we do not ordinarily speak of as being "shipped."

Another consideration convinces us that this Act did not contemplate its application by indirection to such a situation as we have in hand. Its indirect sanctions are well adapted to the producer, miner, manufacturer, or handler in preparation for commerce. They become clumsy and self-defeating when applied to telegraph companies, railroads, interstate news agencies, and the like, as this decree demonstrates. The Western Union is not forbidden by the decree to employ child labor, nor could it be, for it is not so forbidden by the Act. As construed by the courts below, what is prohibited is the sending of telegrams—so long as it employs child labor and for a period of thirty days after it quits. This, as the Company observes, is a sanction that the Court could not permit to become effective. A suspension of telegraphic service for any period of time would be intolerable. Of course, the Government says, the Company could escape its effect except for the thirty-day period by discharging some

twelve per cent of its messengers, who are under age but whom neither the Court nor Congress has forbidden it to employ. It also suggests that the thirty-day period may be absorbed in delays. Or, it says, the District Court or Circuit Court of Appeals "may properly stay the injunction further in order to permit the transmission of messages until petitioner has a reasonable time to comply."

Of course literal compliance could be made only by ceasing to send messages, since that is all the decree does or could command. But the Company could and probably would avoid doing what the decree orders, by doing what it does not and cannot order: viz., discharging the under-age part of its messenger force. This, however, would leave the thirty-day period after our mandate becomes final and goes down, during which the courts must stay the force of the injunction, either candidly or by dilatory tactics, or the Company, by continuing service to the public, would be in contempt. Even if this were done, courts cannot stay the provisions under which the sending of messages during such period is made criminal. We may suppose the Government would not actually prosecute. But that is only because the sanctions of the Act, if applied to such a situation, are so impractical that a violation adjudged by us to be proven by stipulation of the parties as to the facts would be waived. We think if Congress contemplated application of this Act to the Western Union it would have provided sanctions more suitable than to forbid telegrams to be sent by the only Company equipped on a nation-wide scale to serve the public in sending them. Nor will we believe without more express terms than we find here that Congress intended the courts to issue an injunction which as a practical matter they would have to let become a dead letter, or enforce at such cost to the public, if a defendant proved

stubborn and recalcitrant. If the indirect sanctions of this Act were literally to be applied to great agencies of transportation and communication, the recoil on the public interest would be out of all proportion to the evil sought to be remedied.

However, the indirect sanction of cutting one's goods off from the interstate market is one which can be applied to producers, as we have defined them herein, effectively and without injury to the public interest. If such a producer using child labor is refused facilities to transport his goods, competitors usually come in, needs are still supplied, and only the offender suffers. These indirect sanctions can practically and literally be applied to the miner and the manufacturer with no substantial recoil on the public interest, and with no gestures by the courts that they cannot follow through to punish disobedience.

Ascertainment of the intention of Congress in this situation is impossible. It is to indulge in a fiction to say that it had a specific intention on a point which never occurred to it. Had the omission of a direct prohibition of this employment been called to its attention, it might well have supplied it, for any reason we can see. Congress of course has the right to be indirect where it could be direct and to be obscure and confusing where it could be clear and simple. But had it determined to reach this employment, we do not think it would have done so by artifice in preference to plain terms. It is admitted that it is beyond the judicial power of innovation to supply a direct prohibition by construction. We think we should not try to reach the same result by a series of interpretations so far-fetched and forced as to bring into question the candor of Congress as well as the integrity of the interpretative process. After all, this law was passed as the rule by which employers and workmen must order their daily lives. To translate this Act by a process of inter-

pretation into an equivalent of the bills Congress rejected is, we think, beyond the fair range of interpretation. Declining that, we cannot sustain the Government's bill of complaint.

*Reversed.*

MR. JUSTICE MURPHY, dissenting.

By reading into the Fair Labor Standards Act an exception that Congress never intended or specified, this Court has today granted the Western Union Telegraph Company a special dispensation to utilize the channels of interstate commerce while employing admittedly oppressive child labor. Such a result is reached, to borrow the words of the majority opinion, "by a series of interpretations so far-fetched and forced as to bring into question the candor of Congress as well as the integrity of the interpretative process."

The opinion of the Court demonstrates that the legislative history of the Fair Labor Standards Act is inconclusive insofar as the failure to insert a provision directly prohibiting child labor in interstate commerce is concerned. But that factor is neither determinative nor even significant in the setting of this case. The issue is not whether the child labor provisions of § 12 (a) apply to a company solely engaged in interstate commerce or in the transporting of goods in such commerce. Rather the crucial problem is whether Western Union, in preparing messages for transmission in interstate commerce, may fairly be said to be a "producer" of "goods" which it "ships" in interstate commerce so as to come within the purview of § 12 (a). That Western Union may also be the interstate transmitter of messages is beside the point; it is enough if it is a producer of goods destined for interstate shipment. Indeed, § 15 (a) (1) expressly envisages just such a situation. It provides in part that no common carrier shall be liable under this Act "for the transporta-

tion in commerce in the regular course of its business of any goods not produced by such common carrier," thereby recognizing that if a carrier is actually the "producer" of the "goods" it transports it may be visited with the liabilities of § 12 (a).

In approaching the problem of whether Western Union is a producer of goods shipped in interstate commerce we should not be unmindful of the humanitarian purposes which led Congress to adopt § 12 (a). Oppressive child labor in any industry is a reversion to an outmoded and degenerate code of economic and social behavior. In the words of the Chief Executive, "A self-supporting and self-respecting democracy can plead no justification for the existence of child labor. . . . All but the hopelessly reactionary will agree that to conserve our primary resources of man power, Government must have some control over . . . the evil of child labor. . . ." Message of the President to Congress, May 24, 1937, House Doc. No. 255 (75th Cong., 1st Sess.) p. 2. Congress sought in § 12 (a) to translate these sentiments from rhetoric to law. That it may not have done so to the full limits of its constitutional power is not of controlling significance here. It matters only that courts should not disregard the legislative motive in interpreting and applying the statutory provisions that were adopted. If the existence of oppressive child labor in a particular instance falls within the obvious intent and spirit of § 12 (a), we should not be too meticulous and exacting in dealing with the statutory language. To sacrifice social gains for the sake of grammatical perfection is not in keeping with the high traditions of the interpretative process.

The language of § 12 (a), when viewed realistically and with due regard for its purpose, compels the conclusion that Western Union has been guilty of a violation of the child labor provisions. Oppressive child labor condi-

tions are admitted and the only issue concerns the application of the words "goods," "producer" and "ships" to the activities of Western Union.

1. The opinion of the majority concedes that telegraphic messages are "subjects of commerce," *Gibbons* v. *Ogden,* 9 Wheat. 1, 229–230, and hence are "goods" as defined in § 3 (i) of the Act.

2. The majority holds, however, that Western Union is not a "producer" of goods, even though the term "produced" is defined in § 3 (j) to include "handled, or in any manner worked on." It further holds that the words "handled" or "worked on" refer only to incidental operations preparatory to putting goods in the stream of commerce and that they cannot relate to a "handling" or "working on" which accomplishes the interstate movement in commerce itself (which is said to characterize Western Union's activities). Even if we assume that this distinction is correct, however, it does not preclude Western Union from being described as a "producer." Contrary to the view expressed in the majority opinion, the Government does not ground its case in this respect on a claim that mere transportation of goods by a carrier such as Western Union constitutes a "handling" or "working on" so as to make that carrier a producer. The contention, rather, is that Western Union employees, *prior to the introduction of the messages into interstate commerce,* "work on" and "handle" the messages. And that contention would seem to be justified by the facts.

Before the messages actually move in commerce, Western Union employees aid in the composition of the messages, write them on blanks, mark the written messages, transform them into electric impulses and perform numerous other incidental tasks. In a very real and literal sense, therefore, they "handle" and "work on" a message before it enters the channels of interstate commerce. The unique-

ness of Western Union insofar as it acts also as the interstate carrier of these messages does not negative the fact that it actually processes and hence "produces" the messages as a preface to that interstate transit.

3. Finally, the majority does not think that the verb "ship" is applicable to the transmission either of electrical impulses or intangible messages and hence Western Union does not "ship" goods in commerce within the meaning of § 12 (a). As a matter of linguistic purism, this conclusion is not without reasonableness. But proper respect for the legislative intent and the interpretative process does not demand fastidious adherence to linguistic purism. This Court does not require that Congress spell out all types of "goods" or "subjects of commerce" that move in interstate commerce; no more should it require that Congress spell out every verb that may be in usage as to various goods or subjects of commerce. If the verb actually used by Congress may fairly be interpreted to cover the particular situation in a manner not at variance with the intent and spirit of the statute, no sound rule of law forbids such an interpretation.

As a matter of fact, it is unnecessary to strain reality in order to apply the verb "ship" to the transmission of telegraph messages. The verb is defined by competent authority to mean "to transport, or commit for transportation." Webster's New International Dictionary (2d Ed.). This Court itself has referred to telegraph companies as engaged in "transportation" of messages. *Western Union Tel. Co.* v. *Texas,* 105 U. S. 460, 464. Since messages are "goods" and since Western Union is the "producer" of them, there is no difficulty in saying that it "ships" or "transports" the messages in commerce when its employees send them across state lines.

Such an interpretation and application of the clear statutory words are not only realistic but are in obvious

accord with the statutory policy of eliminating oppressive child labor in industries transporting goods and subjects of commerce across state lines. The natural ease with which these words fit the activities of Western Union adds weight to the conclusion that § 12 (a) covers just such a situation as this. There is nothing in the statute or in its legislative background to suggest that telegraph companies are exempt and the consistent administrative attitude has been that no such exemption exists. Child Labor Regulation No. 3, issued by the Chief of the Children's Bureau, U. S. Department of Labor, May 8, 1939; Wage and Hour Field Instructions, June 4, 1942. It is indisputable that the evils of oppressive child labor allow no distinction in favor of the employment of telegraph messengers of tender years. Cf. *United States* v. *Rosenwasser*, 323 U. S. 360. Indeed, the reference to messengers in § 14 of the Act is evidence of an awareness by Congress that the Act would reach such persons. If Congress found it necessary to provide in § 14 for certain exceptions as to minimum wages for messengers, it seems clear that Congress thought that all other appropriate provisions of the Act applied to all messengers absent specific exceptions. Moreover, even § 14 makes no distinction between messengers working in and about manufacturing establishments shipping goods in commerce, who presumably still come within the provisions of § 12 (a) under the majority's view, and those employed by telegraph companies. Under these circumstances we are not justified in delineating an exception to § 12 (a) that Congress itself did not see fit to make explicitly.

A word need be said about the Court's fear of enforcing § 12 (a) against Western Union. Pursuant to the Congressional mandate, the trial court enjoined Western Union from transmitting or delivering for transmission in commerce "telegraph or other messages or any other

goods" produced by it in any establishment in or about which within 30 days prior to the transmission there shall have been employed any oppressive child labor. It is said, however, that this is a sanction that we dare not permit to become effective since the suspension of telegraphic service for 30 days would be intolerable. Such a sanction is said to be well adapted to the producer, miner, manufacturer or handler but clumsy and self-defeating when applied to telegraph companies, railroads and the like. Convinced by these considerations that the Act did not contemplate its application to this situation, the Court proceeds to carve out a judicial exception to § 12 (a) for all interstate carriers.

However much we may dislike the imposition of Congressional sanctions against a particular industry or field of endeavor, the judicial function does not allow us to disregard that which Congress has plainly and constitutionally decreed and to formulate exceptions which we think, for practical reasons, Congress might have made had it thought more about the problem. To read in exceptions based upon the nature or importance of the particular industry or corporation is dangerous precedent. If the suspension of telegraphic service for 30 days is so intolerable as to justify lifting the burden of § 12 (a) from the shoulders of Western Union, can it not be argued with equal fervor that a 30-day injunction against interstate shipments by an airplane manufacturer, a munitions plant or some other industry vital to a war or peace time economy would be likewise intolerable? What valid distinction in this respect is there between interstate carriers and manufacturers or producers? Moreover, are we to examine the competitive situation or degree of importance of a particular company to determine the amount of intolerableness which a suspension of interstate transportation might engender? These and countless other legis-

lative problems present themselves when we embark upon a course of fashioning exceptions to a statute according to our own conceptions of appropriateness of the sanctions of an Act. Such a course is an open invitation to wholesale veto of valid and reasonable legislative provisions by means of judicial refusal to apply statutory enforcement measures. Adherence to the sound rule that inequities and hardships arising from statutory sanctions are for Congress rather than the courts to remedy by way of amendment to the statute is desirable and necessary in such a situation.

We are charged with the duty of interpreting and applying acts of Congress in accordance with the legislative intent. Courts are not so impotent that they cannot perform that duty and, at the same time, grant stays or other appropriate relief in the public interest should the occasion demand it. See *Standard Oil Co.* v. *United States,* 221 U. S. 1, 81; *United States* v. *American Tobacco Co.,* 221 U. S. 106, 187, 188. Thus if the injunction is granted here against Western Union, we will have vindicated to that extent the public policy against oppressive child labor. If a 30-day suspension of telegraph messages would unduly harm the public interest, a stay of the mandate or of the injunction can be granted until at least 30 days have elapsed during which no oppressive child labor has been employed by Western Union. Thus by fashioning remedies through injunctions and stays we can aid in the elimination of oppressive child labor without undue hardship on the public. This can and should be done without abdicating our judicial function and assuming the role of the legislature.

MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE RUTLEDGE join in this dissent.