Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

WILLMARK SERVICE SYSTEM, INC., a corporation, Defendant.

Civ. No. 5731.

United States District Court
D. Minnesota,
Fourth Division.

Nov. 20, 1961.

Charles A. Donahue, Solicitor, Herman Grant, Regional Attorney, and John H.

Secaras, Attorney, United States Department of Labor, Chicago, Ill., for plaintiff.

Richard A. Moore and A. Patrick Leighton, of Faricy, Moore & Costello, St. Paul, Minn., for defendant.

NORDBYE, District Judge.

Plaintiff seeks to enjoin the Minneapolis branch of Willmark Service System from paying certain employees of this branch at rates less than those required by the Act. Much of the material evidence has been stipulated. The primary issues presented are (1) whether the defendant's branch supervisor and shopper employees are engaged in interstate commerce or in the production of goods for commerce within the meaning of the Act; (2) whether the Minneapolis branch of Willmark is exempt as a retail or service establishment within the meaning of Section 13(a) (2) of the Act; and (3) whether certain get-ready and waiting time of the Minneapolis supervisor and shopper employees constitutes hours within the meaning of the Act.

The defendant is an institution rendering a "shopping service", with certain other services identified therewith, throughout the United States and parts of Canada. Its central and executive offices are located in New York City. It has 29 branches located in 23 States and employs some 428 persons, 78 of whom are identified with the New York office and 350 at the various branches. In this proceeding, we are concerned only with the employees known as shoppers and their supervisors, who render shopping investigative services for defendant's customer establishments located in Minnesota, Iowa, parts of Canada, and until 1959 in Wisconsin. The Minneapolis office has a manager, bookkeeper, stenographer, a part-time clerk, two supervisors and three shoppers.

So far as the issues here are concerned, the work of the shoppers and the supervisors is considered to be substantially identical. They are the investigative employees of Willmark. The usual shopping crew consists of one male supervisor and two female shoppers, who pose as shoppers and service Willmark customers in the assigned area of the Minneapolis branch. They assume to conduct themselves as normal shoppers in the customers' stores by asking questions about the merchandise for sale in the particular department, and no doubt attempt to simulate the manners and attitude of the usual shopper so as to obtain information as to the courtesy, efficiency, ability and honesty of the clerk who attends them. They may or may not purchase something in the particular department which is being "shopped". When merchandise is purchased, they determine whether the correct amount is registered on the cash register, whether a receipt is given, depending upon the rule or practice in the establishment in that regard, and make a mental note of any other pertinent factors which may be of concern or interest to the customer. Each member of the shopping crew, as well as the supervisor, prepares a separate report when engaged in shopping. Some of these reports are *in considerable detail and are made out* on forms sent to the Minneapolis branch from the defendant's New York office. A copy of the report is generally left with an official or representative of the customer, but where the home or regional office of the customer is located away from the establishment investigated, the copy is mailed to the customer's home office. Many of the defendant's customers in the Minneapolis area have their home offices in States other than Minnesota. Under these circumstances, a copy of the report is mailed directly to the out-of-state home office. From 21 to 30 per cent of all written reports prepared by the investigative employees are mailed to points outside the State of Minnesota. The actual mailing, however, is done by the clerical employees of the Minneapolis branch who are not involved here.

If a shopper or supervisor ascertains in the course of making a purchase or otherwise that an irregularity has taken place on the part of the clerk, a violation report is made out. At times such an incident is followed up by a personal interview by

the supervisor with the clerk. Any verified or confirmed irregularity, with the details thereof, is reported to the store manager and copies are mailed by the Minneapolis branch clerical employees to the home office of the customer and to the defendant's New York City office, where the report is placed in what is termed the "Employees Information File". This file contains many hundreds of thousands of records listing the names of employees throughout the Nation who have committed irregularities according to the reports of Willmark shoppers and supervisors. These records are made available to defendant's customers in the event a customer desires to check the record of any of its employees with the information contained in this file.

The investigative employees of the Minneapolis branch prepare various types of reports. One is called the "Selling Quotient Builder", usually called the S. Q.B. report. Other reports include the "Refund Service Reports", "Narrative Reports", "Cashiering Reports", and "Tax Reports". These reports are so named by the defendant in order to indicate the type of a report which is rendered. For instance, the "Selling Quotient Builder" purports to grade and rate the various qualifications of the sales person and thus informs the Willmark customer whether the particular sales person is efficient or otherwise in any particular phase of salesmanship. Such reports give a customer information about the various sales persons in his establishment and may enable him to correct the selling deficiencies which may exist as reflected in a particular report. The "Refund Service Report" is used when merchandise purchased is returned by an investigative employee. The "Narrative Report" is used when the investigative employees state in narrative form his or her observations or experience with a certain sales person. The "Tax Report" pertains to the clerk's handling of the item of taxes either Federal or State on the merchandise sold. The "Cashiering Report" presumably refers to the activities in the cashier's department.

Not only do many of these records have a predestined journey in interstate commerce as soon as they are prepared, but when they are thus received and considered at the defendant customer's out-of-state office, they are again sent in commerce to the local managers of the customer with instructions as to suggested remedies for the situation reflected therein. Oftentimes these investigative employees purchase merchandise from a customer's store and in many instances the goods so purchased are taken by these employees to the defendant's branch office, where the clerical employees return such merchandise to the home office or central warehouse of the customer located outside the State of Minnesota.

It should be noted that it is admitted by the defendant that supervisors and shoppers are required to perform work without the State of Minnesota and the defendant recognizes that during the time they are so engaged, these employees are in commerce and subject to the Act. In fact, the investigative employees agree to perform out-of-state work when they are hired at the Minneapolis branch. According to the stipulation entered into herein, these investigative employees have been paid overtime for hours recorded by the employees in excess of forty when engaged in work outside of the State of Minnesota. But apparently by reason of inadequate records, there have been occasions when out-of-state work by these employees were not accorded the overtime compensation as required by the Act. In any event, defendant recognizes that it is required to keep accurate records of out-of-state work by these employees and that when so engaged they are under the Act. Therefore, in considering the questions submitted here, it would seem that the Court should confine its consideration to the employees engaged in shopping services solely within the confines of the State of Minnesota.

The question as to whether these investigative employees engaged in the State of Minnesota are in commerce or are producing goods for commerce may not be free from doubt. And although it

is the nature and character of the work of the investigative employees which controls, and not that of the employer, nevertheless it seems necessary to consider the over-all picture of defendant's nation-wide and Canadian activities and the relation of the local investigative employees thereto in determining whether or not these employees are under the Act. As stated, the defendant renders the services above described to various business institutions throughout the United State and parts of Canada. It has an annual gross income of some three million dollars. All of its administrative activities are centered in New York, and from there it conducts national advertising by means of newspapers, merchandise magazines, circulars, displays at business conventions, etc. All contracts with its customers are billed from the home office. All payments are made by the customer to the New York office. Signs and other material to be displayed on the premises of the defendant's customers and designed to create preventive moral influence and forces over the employees' honesty and efficiency are prepared and distributed directly from the New York office to the defendant's customers. The local manager of the Minneapolis branch, as well as other local branch managers, daily prepare instructions to the local supervisors, and each week a copy of these instructions is mailed by the clerical employees to defendant's home office. There are regular communications by mail, telephone and telegraph from the home office to the branch managers. Bulletins and memos are sent out from the New York office from time to time to the branch offices, and the supervisors and shoppers must acknowledge the receipt of such bulletins by initialing the same. They are required to read and follow the instructions in performing their investigative work. The bottom portions of the bulletins signed by the supervisors and shoppers are mailed back to the New York office. These employees when first hired are required to read certain training material sent out from the home office, and within a period of two months after being employed are required to complete certain tests sent out by the home office. When the tests are completed by these employees, they are mailed back to the New York office by the local clerical employees. The Minneapolis payroll and schedule of expenses of the office are prepared by the local bookkeeper and these are mailed to the New York office. The payroll includes the daily and weekly time records of the shoppers and supervisors.

In determining whether these employees are under the Act, the Court will consider first the question as to whether or not the evidence justifies a finding that they are engaged in the production of goods in commerce. Section 3(j) of the Act provides:

" 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

Section 3(i) of the Act as amended provides:

" 'Goods' means * * * articles or subjects of commerce of any character, or any part or ingredient thereof, * * *."

In determining whether or not these employees are engaged in producing goods in commerce, the Court cannot completely isolate the work of these employees from the over-all activities of Willmark. The business of this company, while primarily one which renders a shopping service to customers in a local area, necessarily creates in the performance of this work a continuous flow of reports, records and documents between the branch and head offices and from

the branch office to its customers out of state. The continuous transmission of some of the investigative reports from the local office to the New York office constitutes an indispensable adjunct to defendant's business. They are part and parcel of defendant's interstate activity. They are prepared by the shoppers for the express purpose of having them transmitted in commerce. Likewise, the investigative reports sent to out-of-state customers have a destination in commerce from the time they are prepared, and the stop at the branch office does not terminate their predestined interstate journey. It would be unrealistic to conclude that the clerical work of the local office employees marks the beginning of the transmission of these reports in commerce. As stated, from 21 to 30 per cent of all written shopping reports are prepared by these investigative employees for the express purpose of putting them into commerce to customers in order to comply with the contract provisions entered into by the defendant and the customers.

The defendant seriously questions and challenges the sufficiency of the evidence to justify a finding that these reports are "goods" and "produced" within the meaning of the Act, citing, among many other cases, Bozant v. Bank of New York, 2 Cir., 156 F.2d 787. But these reports, although they are not goods in ordinary parlance, nevertheless have a tangible value and are in effect sold to the customer. They constitute the primary production of defendant's far-flung business activities, and to all intent and purposes are the "goods" which the defendant produces for its customers, some of which are local and others out of state. We are not dealing with correspondence or papers which merely reflect business transactions between two concerns. Here, these reports constitute the tangible thing for which the customer pays a consideration to the defendant. From April 1, 1955, to December 31, 1955, 14,872 reports were made out by these investigative employees, and of that number, 3,272 were sent outside of the State

of Minnesota. And from January 1, 1957, to March 21, 1957, 4,928 investigative reports of the Minneapolis branch were made out by these employees and of that number 1,084 were transmitted outside of this State. Indeed, the crux of the defendant's business is the production of various types of reports produced by its investigative employees. Such production is the very essence and a vital part of defendant's business. They are the "goods" which defendant sells to its customers. In view of the statutory definition of goods as reflected in Section 3(i) of the Act as amended, it is difficult, in light of the evidence, to escape the clear impact of that provision in establishing that these reports are worked on and produced for commerce by the employees in question.

Consideration of the various cases which have been concerned with similar questions brings one into a realm of decision law which seems to be in hopeless confusion. Cases may be found which support defendant's position in its contention that these reports do not constitute goods, such as Mitchell v. Welcome Wagon, W.D.Tenn.1954, 139 F.Supp. 674, aff'd 6 Cir., 232 F.2d 892; Mitchell v. Household Finance Corp., 3 Cir., 1953, 208 F.2d 667; Mitchell v. Krout, N.D. Calif.1957, 150 F.Supp. 857. But see Mitchell v. Aetna Finance Co., 1 Cir., 1957, 247 F.2d 190; Powell v. U. S. Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (which held that coverage of the Act includes articles produced for commerce although they are not intended for sale, exchange, or for the usual trading merchandise); Union Nat. Bank of Little Rock v. Durkin, 8 Cir., 1953, 207 F.2d 848; Craig v. Far West Engineering Co., 9 Cir., 1959, 265 F.2d 251, 72 A.L.R.2d 1143; Mitchell v. Joyce Agency, Inc., 1955, 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740; Western Union v. Lenroot, 1945, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414.

After rather prolonged consideration, this Court has concluded that it should adopt a liberal construction of the Act, which view is increasingly mani-

fested in the well-considered decisions of the courts. It follows, therefore, that the Court concludes that the shoppers and supervisors are engaged in the production of goods for commerce within the meaning of Section 3(j) and 3(i) of the Act.

In view of the foregoing, it does not seem necessary to discuss at any great length the question as to whether these employees are engaged in commerce within the meaning of the Act. Suffice it to say that, in addition to the production of goods for commerce, and in summary, the supervisors receive their written instructions daily and each week copies thereof are forwarded to the home office by the manager; supervisors and shoppers frequently receive written bulletins, instructions and memoranda from the home office; shoppers when first hired must pass written tests which are sent to them from New York and returned by them in commerce; some of the merchandise bought by the shoppers and supervisors is returned to out-of-state home offices or warehouses of the customers; the branch is operated by moneys made available by the home office; supplies and report forms are received by the local branch from the home office for the use of the shoppers and supervisors; and finally, these shopping employees must be considered to be an integral part of the defendant's nation-wide interstate business. Their activities cannot be considered as being in a vacuum. They directly and vitally relate to defendant's interstate activities.

In determining that these employees are under the Act in that they fairly come within the concept of producing goods for commerce, and that they are also in commerce within the meaning of the Act, the Court is not unmindful that it should not construe the Act so as to intrude upon purely local matters. On the other hand, one should not hesitate to be realistic and entirely mindful of the part that these employees play in the defendant's nation-wide activities.

 The question as to whether this defendant is a retail or service establishment and thus exempt within the meaning of Section 13(a) (2) is far less difficult than the problem of commerce. The sole issue is whether these investigative employees are engaged in a retail or service establishment, and therefore are exempt under the Act. Admittedly, the burden rests upon the defendant to establish that it clearly comes within this exemption. The recent decisions of the Court of Appeals in Goldberg v. Sorvas, 3 Cir., 294 F.2d 841, and Goldberg v. Conjetta R. Roberts, et al., 9 Cir., 291 F.2d 532, 533, are strikingly apposite here. The facts in the Sorvas case are substantially the same as those before this Court. Sorvas was doing business as the "Merit Protective Service" and was engaged in rendering shopping service carried on by investigative employees chiefly in the western part of Pennsylvania, but also on occasions in Ohio, West Virginia and Kentucky. Sorvas contended and testified that his business was regarded in the shopping service industry as retail. However, the court concluded that the shopping service of Sorvas was a specialized service which the general consuming public did not have occasion to use, and held that he fell within the category of establishments which had never been recognized as making sales of services at retail, citing Mitchell v. Kentucky Finance Co., 1958, 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815; Durkin v. Joyce Agency, Inc., N.D.Ill.1953, 110 F.Supp. 918, aff'd sub nom. Mitchell v. Joyce Agency, Inc., 1955, 348 U.S. 945, 75 S.Ct. 436, 99 L.Ed. 740; Fleming v. A. B. Kirschbaum Co., 3 Cir., 1941, 124 F.2d 567, aff'd sub nom. Kirschbaum Co. v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Goldberg v. Roberts, et al., supra. Moreover, the Sorvas decision is supportive authority for plaintiff's position that it is reasonably clear that, before the 1949 amendment of the Act, shopping concerns fairly came within the administrative interpretation of non-retail concerns. In that regard, the court stated (pp. 846–847 of 294 F.2d):

"Prior to 1949 the Administrator had not specifically named 'shop-

ping service' establishments as excluded from the Section 13(a) (2) exemption. However, as early as 1941 the following service type businesses among others, were listed by the Administrator as not in the ordinary case sufficiently similar in character to retail establishments to be considered service establishments within the meaning of § 13(a) (2):

"'* * * [E]stablishments engaged in supplying business, financial, and statistical reporting data; * * * adjustment and credit bureaus and collection agencies; credit-rating agencies; * * * [and] employment agencies.'

"The analogy between 'establishments engaged in supplying business, financial, and statistical reporting data,' 'adjustment and credit bureaus and collection agencies', 'credit rating agencies' and the services offered by Sorvas is so striking as to be obvious. Clearly the Administrator was not attempting to name every form of 'retail and service' business in his interpretative regulation. He was giving illustrations of categories into which this case fits.

"Congress made plain its intention that in adopting the 1949 amendment to Section 13(a) (2) it was only clarifying the existing exemption by defining the term retail or service establishment and stating the conditions under which the exemption shall apply in order to obviate the sweeping ruling of the Administrator and the courts that no sale of goods or services for business use is retail. Its only effect was to confirm the exemption for the various local neighborhood businesses which the original 1938 statute sought to exempt and which were traditionally regarded as retail.

"After the passage of the 1949 amendment the Administrator revised his Interpretative Bulletin. In considering the general subject of the Section 13(a) (2) retail or service exemption; the legislative background leading to the amendment; the application of the retail concept and the characteristics of a retail or service establishment, among other things, he stated:

"'* * * [T]here are establishments which carry on their activities as a part of the process of the production of goods, and establishments which have a specialized function to perform in the industrial, mercantile or financial organization of the nation; such establishments, typically, provide financial, commercial, and industrial enterprises with specialized goods or services which the general consuming public does not ordinarily have occasion to use. These establishments are not engaged in activities which are recognized as retail within the meaning of the exemption even though they may also sometimes sell goods or render services to the general consuming public while performing such function. Such activities as they perform are not recognized as retail as that term is traditionally and commonly understood. The concept of retail selling or servicing is alien to the types of activities performed by these establishments. The following examples will illustrate that type of activity.

* * * * *

"'(6) Advertising agencies provide industrial, commercial and financial organizations with specialized services which the general consuming public does not ordinarily have occasion to use. Such establishments have never been recognized as making sales of goods or services at retail.' W. and H. Reg., 29 C.F.R. § 779.9 (Supp.1961).

"The shopping service rendered by Sorvas has no more claim to recognition at retail than an advertising agency. But the Administrator

went a step further in the 1950 regulations. In again promulgating a list of types of establishments the sales or service of which are not recognized as retail he included a classification directly fitting the service Sorvas renders, namely:

> "'Job efficiency checking and rating; establishments engaged in the business of dealing in.' 29 C.F.R. § 779.10(b) (Supp. 1961.)

> "These interpretative Rulings of the Administrator, while not of a conclusive nature are entitled to substantial weight. Those under present consideration are consistent with the Act and are based upon logical and rational reasoning. Sorvas's 'shopping service' is a specialized service which the general consuming public does not have occasion to use. It falls within the category of establishments which have never been recognized as making sales of services at retail."

The testimony before this Court did not preponderate in support of defendant's claim of exemption herein under Section 13(a) (2) so as to mitigate the force and persuasive effect of the conclusions reached in the Sorvas case. There is in the record before this Court an absence of any satisfactory evidence that the specialty of shopping services rendered by the defendant has traditionally been considered and known as retail services. The opinion testimony given by witnesses on either side was not particularly helpful. It merely represented an attempt of the witness to state his own conclusions as to whether this shopping service was retail or otherwise. For instance, one witness testified that the investigative employees were engaged in a retail service because the services were rendered to retailers. On the other hand, he admitted that, if the service was rendered to wholesalers, they probably would then be rendering wholesale services rather than retail.

It may be noted here that plaintiff places some reliance upon the fact that the defendant has taken out a detective license in the State of Minnesota, and hence it is argued that its services should be considered in the same light as detective work which has never been considered as retail service. However, the mere fact that defendant concluded that it was advisable to comply with the state law regarding investigative agencies does not place a concern rendering shopping service in the same category as a detective agency.

In any event, it seems unmistakably clear that the unique business of rendering shopping services has never had the traditional retail concept. And the mere unsupported opinions of witnesses cannot place these services in that category. The Court is clear that there is an absence of sufficient evidence in the record which would justify a finding that the service rendered by the Minneapolis branch shoppers and investigators comes within the terms or the spirit of the exemption as a retail or service establishment.

■ The remaining question refers to whether the time during the work day when shoppers are required to wait must be counted as work time under the Act. The parties have stipulated as to the facts in this regard and the pertinent portions are as follows:

> "2. On various occasions shoppers employed at the Minneapolis branch office of defendant, Willmark Service System, Inc., while performing work as members of office crews or car crews (such being: Office crew—this crew consists of shoppers working directly out of the Minneapolis branch office who conduct shopping tests in downtown Minneapolis only; and, car crew—this crew consists of a supervisor and two shoppers working directly out of the Minneapolis branch office who conduct shopping tests in the outskirts of Minneapolis and in St. Paul, Minnesota.) have been required to report to the Minneapolis branch office of the Willmark Com-

pany in the morning for the following purposes:

"(1) to receive their assignments for the day, (2) to receive special instructions, (3) to receive any bulletins that might be necessary to carry out their assignments, (4) to receive funds with which to make their purchases in connection with the tests, and (5) to wait to obtain any of the above information, date, or money.

"The time spent in the various activities described above may vary from 15 minutes to two hours. On certain occasions this time has not been reflected on the time records kept and preserved by defendant, Willmark Service System, Inc., as hours worked. The working day of the shopper has been reflected in such instances on these records as commencing at the time of the shopper's arrival at the first establishment to be tested.

"3. There are instances during the work day when the supervisor is conferring with the representative of a subscriber, finishing a survey, questioning a person suspected of dishonesty, or having his car repaired.

"These periods may occur when a car crew is in downtown St. Paul, at a shopping center, at one of the outlaying centers of St. Paul and Minneapolis, or any business district or outlaying areas of St. Paul or Minneapolis or other towns and villages in Minnesota, Wisconsin or Canada. When these periods occur the supervisor informs his shoppers that there is no need for their services for a certain period of time.

"The supervisor instructs the shoppers that they are therefore released for this fixed period of time, but must report back at the end of that period. The shoppers in most instances do not live in the vicinity of the establishment being tested. In other instances while on road trips they may or may not be in the vicinity of the hotel where they are staying.

"As a rule the shoppers remain in or about the vicinity where they are to be met by the supervisor and may, among other things, use the time: (1) to sit and wait for the supervisor, (2) to have a cup of coffee, or (3) to attend to other personal matters. These aforesaid periods of time are not considered hours worked by Willmark and are reflected on the time records prepared by the shoppers and supervisors as 'free time'.

"The 'free time' periods involved have varied from (a) 15 minutes, (b) 30 minutes, (c) 45 minutes, (d) one hour, (e) one hour and 15 minutes, (f) one hour and 30 minutes, (g) one hour and 45 minutes, and (h) two hours.

"4. On certain occasions when 'free time', as more fully described above in Paragraph 3, has been declared the shoppers have utilized such periods to prepare reports. On such occasions such 'free time' so utilized has been reflected on the time records prepared by the shopper as 'free time' and has not been considered hours worked by defendant Willmark."

It would appear that two situations are presented. On occasions—rare, the defendant contends—shoppers and supervisors come to the office at the regular hour and must await the fulfillment of the activities noted in Paragraph 2, Subdivisions 1 to 5, of the stipulation. However, in its brief, the defendant freely recognized that these periods constitute working time. But there is an issue between the parties as to whether the "free time" referred to in Paragraph 3 of the stipulation when occupied by the shoppers other than writing reports should be considered as working time. Although the stipulation speaks in general terms as to that which the shoppers may or may not do in their off-duty periods, it seems evident that these occa-

sions may come at any period of the day and may take place under circumstances where the shoppers can do nothing but await the return and future orders of the supervisor. In other words, there may be no way in which they can utilize the time allotted to them for their own personal affairs or comfort. In any event, the so-called free time is not granted for the benefit of the shoppers. That occurs solely by reason of fortuitous circumstances confronting the defendant. These enforced free-time intervals imposed on the shoppers should be, in view of the factual bases set forth in the stipulation, considered by the defendant as working time.

The defendant objects to the issuance of an injunction in that it represents that, since the announcement of the decision of the Court in this matter, it has complied, and intends to continue to comply, with the Act, subject to its right to appeal herein if it is so advised.

 This litigation has continued for a long period and was stoutly defended by the defendant in every respect. However, defendant has cooperated with the Government in numerous matters during the litigation, which substantially lessened the length of the trial, and it gave every evidence of good faith in defending this proceeding. It is evident that it had a deep-seated belief that it was not subject to the Act. The decisions recognize that the granting of an injunction is a matter that generally rests in the sound discretion of the Court. It does not seem necessary to discuss the numerous decisions of our courts which have been confronted with a question of the issuance of an injunction under the Fair Labor Standards Act. There are ample precedents either way. Certainly, the Court would not err if it granted an injunction as requested. However, each proceeding must be determined on its own facts and in light of the Court's own experience with a long and difficult proceeding. The good faith of the defendant in contesting the litigation, its reliance on advice of counsel, the unsettled questions of coverage as reflected in prior court decisions involving comparable issues, the prompt compliance with the trial court's order herein, and the absence of any showing that would suggest future violations by the defendant, are matters which should weigh heavily in determining the question as to the necessity of the issuance of an injunction. The Court does not understand that the plaintiff has any reservations as to the good-faith intentions of the defendant to comply with the Court's decision herein without prejudice to its right to appeal.

After due consideration, the Court concludes that plaintiff's motion for an order permanently enjoining the defendant from violating the provisions of the Fair Labor Standards Act, as set forth in his motion, be and the same is denied, without prejudice, however, and with the provision that the Court retain jurisdiction of plaintiff's application for an injunction, and the Court reserves the right to consider again the advisability or necessity of the issuance of an injunction as requested by plaintiff. It is so ordered.

Exceptions are reserved.