RADER, Chief Judge, LINN, MOORE, and O’MALLEY, Circuit Judges,
as to all but part VI, concurring-in-part and dissenting-in-part. RADER, Chief Judge, and MOORE, Circuit Judge, as to part VI.[1]
This court again addresses questions regarding patent eligible subject matter. After consideration of the Patent Act and case law precedents, we would reverse the district court’s holding that the asserted system claims are not patent eligible. Chief Judge Rader and Judge Moore would, however, affirm the district court’s conclusion that the asserted method and media claims are not eligible for patenting. Judges Linn and O’Malley write separately as to these latter claims. Accordingly, we would remand for additional proceedings consistent with this opinion.
I
Alice Corporation (Alice) owns U.S. Patent Nos. 5,970,479 (the '479 Patent), 6,912,-510 (the '510 Patent), 7,149,720 (the '720 Patent), and 7,725,375 (the '375 Patent). Generally, these patents relate to methods and a computerized system for exchanging obligations in which a trusted third party settles obligations between a first and second party in order to eliminate “settlement risk.” Settlement risk is the risk that only one party will meet its payment obligation. In simple terms, the invention eliminates this risk with a trusted third party that exchanges either both or neither party’s obligation.
Alice’s expert testified by declaration that “[w]hen obligations arise from a trade *1293 made between two parties, e.g., a trade of stock or a trade of foreign currency, typically, there is a gap in time between when the obligation arises and when the trade is ‘settled.’ ” Alice Corp. Pty. Ltd.’s Renewed Cross-Motion for Partial Summary Judgment as to Subject Matter Eligibility, Declaration of Stanley E. Fisher, Exhibit 1, Declaration of Paul Ginsberg at ¶ 21, CLS Bank Int’l v. Alice Corp., 768 F.Supp.2d 221 (D.D.C.2011) (No. 1:07-cv-974), ECF No. 95-3 (Ginsberg Decl.) “In a number of financial contexts, the process of exchanging obligations, or settlement, is separate from the process of entering into a contract to perform a trade.” Id. For example, if two banks want to exchange currency, they would agree to make a transaction but would postpone the actual exchange until confirmation of the price—typically two days later. After that, both banks would “settle” the trade by paying their predetermined amounts to each other. But the time delay presents a risk that one bank would, at settlement time, no longer have sufficient funds to satisfy its obligations.
The asserted patent claims—claims 33 and 34 of the '479 Patent, and all claims of the '510, '720, and '375 Patents—seek to minimize this risk. The relevant claims of the '479 and '510 Patents are method claims. The claims of the '720 and '375 Patents are system and product (media) claims.
In May 2007, CLS Bank International and CLS Services Ltd. (collectively, CLS Bank) sued Alice, seeking a declaration that the asserted claims are invalid, unenforceable, or otherwise not infringed. In August 2007, Alice counterclaimed, alleging that CLS Bank infringed claims 33 and 34 of the '479 Patent, and all claims of the '510 and '720 Patents. The U.S. filing dates of the patents range from 1993 to 2005, with claims to priority going back even earlier.
The parties filed cross-motions for summary judgment on whether the asserted claims were eligible subject matter under Section 101. In May 2010, the '375 Patent issued to Alice, and Alice soon filed amended counterclaims asserting that CLS Bank also infringed all of its claims. After the Supreme Court decided Bilski v. Kapp os, — U.S. -, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010) (Bilski), the parties renewed their cross-motions for summary judgment, with CLS Bank asserting that the newly-added '375 Patent also did not claim eligible subject matter under Section 101.
The district court granted CLS Bank’s motion for summary judgment and denied Alice’s cross-motion. The district court held that no asserted claim contained patent eligible subject matter. CLS Bank Int’l v. Alice Corp., 768 F.Supp.2d 221 (D.D.C.2011), vacated, 484 Fed.Appx. 559 (Fed.Cir.2012). Alice timely appealed, and this court has jurisdiction under 28 U.S.C. § 1295(a)(1). A panel of this court reversed. CLS Bank Int’l v. Alice Corp., 685 F.3d 1341 (Fed.Cir.2012). CLS Bank filed a petition for rehearing en banc. In its order granting en banc reconsideration, this court invited the parties and others to address two questions:
a. What test should the court adopt to determine whether a computer-implemented invention is a patent ineligible “abstract idea”; and when, if ever, does the presence of a computer in a claim lend patent eligibility to an otherwise patent-ineligible idea?
b. In assessing patent eligibility under 35 U.S.C. § 101 of a computer-implemented invention, should it matter whether the invention is claimed as a method, system, or storage medium; and should such claims at times be considered equivalent for § 101 purposes?
CLS Bank Int’l v. Alice Corp., 484 Fed.Appx. 559 (Fed.Cir.2012).
*1294 II
We begin with the text of the statute. See Diamond v. Diehr, 450 U.S. 175, 182, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981); see also Bilski, 130 S.Ct. at 3225; In re Alappat, 33 F.3d 1526, 1542 (Fed.Cir.1994) (en banc). Section 101 provides:
Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.
Section 100(b) further provides that the “term ‘process’ means process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material.”
To understand these provisions in context, the Supreme Court has advised that the “new” requirement in Section 101 is now governed by Section 102. Diehr, 450 U.S. at 189, 101 S.Ct. 1048; see S.Rep. No. 82-1979, at 6 (1952) (“Section 102 ... includes, in effect, an amplification and definition of ‘new’ in section 101.”) (S.Rep.82-1979). Similarly, as shown below, whether a new process, machine, and so on is “inventive” is not an issue under Section 101; the condition for “more” than novelty is contained only in Section 103. Thus, so long as the “conditions and requirements” of patentability are met, a person who invents or discovers a useful process, or an improvement to one, may obtain a patent—and may do so even if the process includes only a new use of an old machine. See Bilski, 130 S.Ct. at 3225; Alappat, 33 F.3d at 1542.
Underscoring its breadth, Section 101 both uses expansive categories and modifies them with the word “any.” In “choosing such expansive terms ... modified by the comprehensive ‘any,’ Congress plainly contemplated that the patent laws would be given wide scope.” Bilski, 130 S.Ct. at 3225 (quoting Diamond v. Chakrabarty, 447 U.S. 303, 308, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980) (some internal quotation marks omitted)).
Defining one of those expansive categories, Section 100(b) confirms the statute’s intended breadth. At first examination, the Act’s definition of “process” to include a new use of a known machine seems superfluous. After all, if “any” process may be patented under Section 101, Section 100(b) seems wholly unnecessary. An examination of the context for adding Section 100(b) informs the analysis of Section 101. Specifically, the 1952 amendments added Section 100(b) to ensure that doubts about the scope of a “process” under the pre-1952 version of the patent statute would not be read into the new Act. P.J. Federico,[2] Commentary on the New Patent Act, reprinted in 75 J. Pat. & Trademark Off. Soc’y 161, 177 (1993) (Federico’s Commentary) (“Remarks have appeared in a few decisions and elsewhere that new uses are not patentable- [I]f such remarks are interpreted to mean that a new use or application of an old machine, manufacture or composition cannot result in anything patentable then such statements are not and have never been an accurate statement of the law.”); Hearing Before Sub-comm. No. 3 of the Comm, on the Judiciary, at 37 (1951) (1951 Hearings) *1295 (Federico testifying that the “definition of ‘process’ has been added ... to clarify the present law as to certain types of methods as to which some doubts have been ex-pressed_”). The 1952 Act shows that the “primary significance” of adding Section 100(b) was to make clear that a method was not “vulnerable to attack, on the ground of not being within the field of patentable subject matter, merely because it may recite steps conventional from a procedural standpoint and the novelty resides in the recitation of a particular substance, which is old as such, used in the process.” Federico’s Commentary at 177; see S.Rep. No. 82-1979, at 17 (“The ... definition clarifies the status of processes or methods which involve merely the new use of a known process, machine, manufacture, composition of matter, or material; they are processes or methods under the statute and may be patented provided the conditions of patentability are satisfied.”).
In addition, in testimony requested by the Committee, P.J. Federico, a chief patent examiner at the United States Patent & Trademark Office (Patent Office), explained that under the proposed amendment a machine or manufacture may include “anything that is under the sun that is made by man.” 1951 Hearings at 37; see S.Rep. No. 82-1979, at 5 (stating the same principle: so long as the conditions of patentability are met, anything made by man is patentable). The Supreme Court summarized the intent and meaning of these changes when it quoted and approved this famous statement. See Diehr, 450 U.S. at 182,101 S.Ct. 1048.
Indeed, to achieve these ends, the 1952 Act did not merely rely on the breadth of Section 101 and the expanded definition of “process” in Section 100(b), but also added the words “or discovered” to the definition of “invention” in Section 100(a). By definition, Congress made it irrelevant whether a new process, machine, and so on was “discovered” rather than “invented.” Both inventions and discoveries are eligible for patenting. This addition confirmed the principle articulated again in Section 103 that an invention “shall not be negated by the manner in which [it] ... was made.” 35 U.S.C. § 103. The language of the Act shows that the authors of the 1952 Act wanted that principle incorporated into the eligibility section of the Act as well as the patentability sections.
One final point confirming the breadth of Section 101 is the 1952 Act’s deliberate decision to place the substantive requirement for “invention” in Section 103. Before 1952, the courts had used phrases including “creative work,” “inventive faculty,” and “flash of creative genius” which compared the existing invention to some subjective notion of sufficient “inventiveness” as the test for patentability—by definition a hindsight analysis. See Giles S. Rich, Principles of Patentability, 28 Geo. Wash. L.Rev. 393, 404 (1960). These standardless terms and tests created wildly disparate approaches to determine sufficiency for “invention.” Id. at 403-04. Judge Rich observed that with “invention” as the test, “judges did whatever they felt like doing according to whatever it was that gave the judge his feelings—out of the evidence coupled with' his past mental conditioning—and then selected those precedents which supported his conclusions.” Sirilla, 32 J. Marshall L.Rev. at 501 (internal quotation marks omitted).
The 1952 Act focused its central purpose on correcting this systemic problem. “One of the great technical weaknesses of the patent system” prior to 1952 was “the lack of a definitive yardstick as to what is invention.” Victor L. Edwards, Cong. Research Serv., Efforts to Establish a Statutory Standard for Invention, at 2 (1958) (Study on Standard for Invention). As Judge Rich testified at the beginning of *1296 this legislative effort in 1948, “the matter of defining invention” was “what we are trying to get away from.” Id. at 4, As Federico put it, “invention” was “an unmeasurable quantity having different meanings for different persons.” Federico’s Commentary at 183 (making the statements in the context of explaining why Congress added Section 103); Principles of Patentability, 28 Geo. Wash. L.Rev. at 407 (“The drafters of the present statute did their best to take out of the law the undefinable concept of ‘invention.’ Whether lawyers will now take advantage of the terminology ... and stop talking nonsense is up to them.”).
After deliberate effort, the 1952 Act replaced any need for an “invention” or “inventiveness” measure with an objective test for “obviousness” in Section 103. See Dann v. Johnston, 425 U.S. 219, 225-26, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976) (explaining that although “an exercise of the inventive faculty” had been used as a judicial test, “it was only in 1952 that Congress, in the interest of uniformity and definiteness, articulated the requirement in a statute, framing it as a requirement of ‘nonobviousness.’ ” (internal quotation marks and footnote omitted)). The official “Revision Notes” explain that Section 103 became an “explicit statement” of the “holding of patents invalid by the courts[ ] on the ground of lack of invention.” S.Rep. No. 82-1979, at 18; see Federico’s Commentary at 180 (explaining that one of the two major changes made by the 1952 amendments was “incorporating a requirement for invention in section 103.” (internal quotation marks omitted)); Study for Statutory Standard of Invention (extensively reviewing Congressional efforts to redefine “invention,” which culminated in adoption of Section 103). Thus, the central thrust of the 1952 Act removed “unmeasurable” inquiries into “inventiveness” and instead supplied the nonobviousness requirement of Section 103.
After enactment of the 1952 Act, both of its principal architects recognized the significance of the elimination of a subjective test for “invention.” Judge Rich, a House Committee architect of the 1952 Act and later an esteemed jurist, applauded the fact that the Patent Act of 1952 makes no “reference to ‘invention’ as a legal requirement.” Principles of Patentability, 28 Geo. Wash. L.Rev. at 405 (emphasis omitted). Judge Rich emphasized that using “the past tense in referring to” what “used to be called the requirement of ‘invention’” could not be overemphasized. Id. (emphasis in original). Federico expressed the same sentiments. See Federico’s Commentary at 182-83 (explaining that while perhaps the word “invented” in the prior patent act may have been the source of judicial demand for more than just novelty, Section 103 replaced any requirement for “invention”).
Contemporaneous commentators also recognized that any need for “invention” had been rejected in favor of nonobviousness. See generally, Karl B. Lutz, The New 1952 Patent Statute, 35 J. Pat. Off. Soc’y 155, 157-58 (1953) (explaining that courts had long ago decided that novelty was not enough and had disagreed on how to determine how much more was necessary, but that that issue was now addressed solely by Section 103); Dean O.S. Colclough, A New Patent Act—But the Same Basic Problem, 35 J. Pat. Off. Soc’y 501, 510 (1953) (explaining that the “condition of inventiveness has been expressed in a variety of ways by the courts,” but the “new provision on inventiveness” in Section 103 was intended to replace and codify prior law). And indeed the courts, including this court, implemented the new statute carefully and religiously. See Graham v. John Deere Co., 383 U.S. 1, 14, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (“Section 103, for the first time in our statute, provides a condition which exists in the law and has *1297 existed for more than 100 years, but only by reason of decisions of the courts.” (internal quotation marks omitted)); W.L. Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1548 (Fed.Cir.1988) (Markey, C.J.) (recognizing the district court improperly relied upon one step of a multistep process to determine nonobviousness); Gardner v. TEC Sys., Inc., 725 F.2d 1338, 1349-50 (Fed.Cir.1984) (recognizing that Section 103 sets forth the standard, and so “synergism”, of a known combination is not required). Thus, any requirement for “inventiveness” beyond sections 102 and 103 is inconsistent with the language and intent of the Patent Act.
With an eye to the statutory language and its background, the Supreme Court recognized Section 101 as “a ‘dynamic provision designed to encompass new and unforeseen inventions.’ ” Bilski, 130 S.Ct. at 3227 (quoting J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int’l, Inc., 534 U.S. 124, 135, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001)). Indeed, the broad interpretation of Section 101 has constitutional underpinnings. “The subject-matter provisions of the patent law have been cast in broad terms to fulfill the constitutional and statutory goal of promoting ‘the Progress of ... the useful ArtsChakrabarty, 447 U.S. at 315, 100 S.Ct. 2204.
In sum, any analysis of subject matter eligibility for patenting must begin by acknowledging that any new and useful process, machine, composition of matter, or manufacture, or an improvement thereof, is eligible for patent protection. While a claim may not later meet the rigorous conditions for patentability, Section 101 makes these broad categories of claimed subject matter eligible for that consideration.
Ill
We turn now to the limited exceptions to the broad statutory grant in Section 101 which the Supreme Court has identified: “ ‘[l]aws of nature, natural phenomena, and abstract ideas’ ” are not patent eligible. Mayo Collaborative Servs. v. Prometheus Labs., Inc., — U.S.-, 132 S.Ct. 1289, 1293,- 182 L.Ed.2d 321 (2012) (quoting Diehr, 450 U.S. at 185, 101 S.Ct. 1048); see also Bilski, 130 S.Ct. at 3225. The motivation for the exceptions to eligibility is to prevent the “monopolization” of the “basic tools of scientific and technological work,” which “might tend to impede innovation more than it would tend to promote it.” Prometheus, 132 S.Ct. at 1293 (internal quotation marks omitted).
A. Scope of the Exception
1. Generally
As the Supreme Court has explained, the relevant inquiry under the exceptions is whether the claim covers merely an abstract idea, law of nature, or natural phenomenon; or whether the. claim covers a particular application of an abstract idea, law of nature, or natural phenomenon. See Prometheus, 132 S.Ct. at 1294 (“[T]o transform an unpatentable law of nature into a patent-eligible application of such a law, one must do more than simply state the law of nature while adding the words ‘apply it.’ ” (emphasis in original)); Bilski, 130 S.Ct. at 3230 (“[W]hile an abstract idea, law of nature, or mathematical formula could not be patented, an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection.” (emphasis in original) (internal quotation marks omitted)); Diehr, 450 U.S. at 187, 101 S.Ct. 1048 (“It is now commonplace that an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection.” (emphasis in original)); Gottschalk v. Benson, 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972) (“He who *1298 discovers a hitherto unknown phenomenon of nature has no claim to a monopoly of it which the law recognizes. If there is to be invention from such a discovery, it must come from the application of the law of nature to a new and useful end.” (emphasis added) (internal quotation marks omitted)).
The claims are key to this patent eligibility inquiry. A court must consider the asserted claim as a whole when assessing eligibility:
In determining the eligibility of respondents’ claimed process for patent protection under § 101, their claims must be considered as a whole. It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis. This is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made.
Diehr, 450 U.S. at 188, 101 S.Ct. 1048 (emphasis added). And, a court must consider the actual language of each claim. The majority in Diehr rejected the minority’s approach ignoring portions of the claims: “[i]n order for the dissent to reach its conclusion it is necessary for it to read out of respondents’ patent application all the steps in the claimed process which it determined were not novel or ‘inventive.’ That is not the purpose of the § 101 inquiry....” Id. at 193 n. 15, 101 S.Ct. 1048 (citations omitted).
Any claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed. Such an approach would “if carried to its extreme, make all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious.” Id. at 189 n. 12, 101 S.Ct. 1048; see also Prometheus, 132 S.Ct. at 1293. A court cannot go hunting for abstractions by ignoring the concrete, palpable, tangible limitations of the invention the patentee actually claims.
Different claims will have different limitations; each must be considered as actually written. The inquiry is a practical one to determine whether the claim, as a whole with all of its limitations, in effect covers a patent ineligible abstract idea or a patent eligible application of that idea. Thus, while the analysis will be different for each claim based on its particular limitations, the form of the analysis remains the same.
The claims in O’Reilly v. Morse, 56 U.S. (15 How.) 62, 14 L.Ed. 601 (1854), and a case described therein, illustrate the distinction between a patent ineligible abstract idea and a practical application of an idea. The “difficulty” in Morse arose with the claim in which Morse
d[id] not propose to limit [himjself to the specific machinery or parts of machinery described in the ... specification and claims; the essence of [his] invention being the use of the motive power of the electric or galvanic current ... however developed for marking or printing intelligible characters, signs, or .letters, at any distances....
Id. at 112 (internal quotation marks omitted). In considering Morse’s claim, the Supreme Court referred to an earlier English case that distinguished ineligible claims to a “principle” from claims “applying” that principle:
[I]t seems that the court at first doubted, whether it was a patent for any thing more than the discovery that hot air would promote the ignition of fuel better than cold. And if this had been the construction, the court, it appears, would *1299 have held his patent to be void; because the discovery of a principle in natural philosophy or physical science, is not patentable.
But after much consideration, it was finally decided that this principle must be regarded as well known, and that the plaintiff had invented a mechanical mode of applying it to furnaces; and that his invention consisted in interposing a heated receptacle, between the blower and the furnace, and by this means heating the air after it left the blower, and before it was thrown into the fire. Whoever, therefore, used this method of throwing hot air into the furnace, used the process he had invented, and thereby infringed his patent, although the form of the receptacle or the mechanical arrangements for heating it, might be different from those described by the patentee.
Id. at 116. The claim in Morse itself was impermissible because it covered “ ‘an effect produced by the use of electro-magnetism, distinct from the process or machinery' necessary to produce it.’ ” The Telephone Cases, 126 U.S. 1, 534, 8 S.Ct. 778, 31 L.Ed. 863 (1888) (quoting Morse, 56 U.S. (15 How.) at 120). This was in contrast to a sustained claim that was limited to:
making use of the motive power of magnetism, when developed by the action of such current or currents, substantially as set forth in the ... description, ... as means of operating or giving motion to machinery, which may be used to imprint signals upon paper or other suitable material, or to produce sounds in any desired manner, for the purpose of telegraphic communication at any distances.
Id. (first ellipsis added, second ellipsis in original) (quoting Morse, 56 U.S. (15 How.) at 85). “ ‘The effect of [Morse] was, therefore, that the use of magnetism as a motive power, without regard to the particular process with which it was connected in the patent, could not be claimed, but that its use in that connection could.’ ” Benson, 409 U.S. at 68, 93 S.Ct. 253 (quoting The Telephone Cases, 126 U.S. at 534, 8 S.Ct. 778).
These examples illustrate that the inquiry under the abstract ideas exception deals not merely with breadth, because the “hot air” claims were broad and covered many “mechanical arrangements” but yet found patent eligible. The concern, which has become clearer through the Supreme Court’s more recent precedents, is whether the claim seeks to patent an idea itself, rather than an application of that idea.
2. Meaningful limitations
The relevant inquiry must be whether a claim includes meaningful limitations restricting it to an application, rather than merely an abstract idea. See Prometheus, 132 S.Ct. at 1297 (“[D]o the patent claims add enough to their statements of the correlations to allow the processes they describe to qualify as patent-eligible processes that apply natural laws?” (emphasis in original)); see also Fort Props., Inc. v. Am. Master Lease LLC, 671 F.3d 1317, 1323 (Fed.Cir.2012) (“[T]o impart patent-eligibility to an otherwise unpatentable process under the theory that the process is linked to a machine, the use of the machine must impose meaningful limits on the claim’s scope.” (internal quotation marks omitted)). An abstract idea is one that has no reference to material objects or specific examples—ie., it is not concrete. See Merriam-Webster’s Collegiate Dictionary 5 (11th ed.2003) (defining abstract as “disassociated from any specific instance ... expressing a quality apart from an object <the word poem is concrete, poetry is [abstract] >”). A claim may be premised on an abstract idea—the question for patent eligibility is whether *1300 the claim contains limitations that meaningfully tie that idea to a concrete reality or actual application of that idea.
Indeed, the Supreme Court repeatedly has stated that a claim touching upon a natural phenomenon, abstract idea, or law of nature is not, for that reason alone, ineligible- for patenting. The Supreme Court clarified the “commonplace” principle “that an application of a law of nature or mathematical formula to a known structure ... may well be deserving of patent protection.” Diehr, 450 U.S. at 187,- 101 S.Ct. 1048 (emphasis in original). For these reasons, a claim does not become ineligible simply because it applies a basic tool. Id.; see Prometheus, 132 S.Ct. at 1294 (explaining that the fact that a claim uses a basic tool does not mean it is not eligible for patenting). The struggle is in drawing the line between claims that are and are not meaningfully limited; fortunately, the Supreme Court’s own cases provide the guideposts for doing so.
First, we know a claim is not meaningfully limited if it merely describes an abstract idea or simply adds “apply it.” See Prometheus, 132 S.Ct. at 1294, 1297. The broad claim in Morse provides a striking example of this. We also know that, if a claim covers all practical applications of an abstract idea, it is not meaningfully limited. See id. at 1301-02. For example, “[allowing petitioners to patent risk hedging would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea.” Bilsk% 130 S.Ct. at 3231 (emphasis added). While this concept is frequently referred to as “pre-emption,” it is important to remember that all patents “pre-empt” some future innovation in the sense that they preclude others from commercializing the invention without the patentee’s permission. Pre-emption is only a subject matter eligibility problem when a claim preempts all practical uses of an abstract idea. For example, the claims in Benson “purported to cover any use of the claimed method in a general-purpose digital computer of any type.” 409 U.S. at 64, 93 S.Ct. 253 (emphasis added). The claims were not allowed precisely because they pre-empted essentially all uses of the idea:
It is conceded that one may not patent an idea. But in practical effect that would be the result if the formula for converting [binary-coded decimal] numerals to pure binary numerals were patented in this case. The mathematical formula involved here has no substantial practical application except in connection with a digital computer, which means that ... the patent would wholly preempt the mathematical formula and in practical effect would be a patent on the algorithm itself.
Id. at 71-72, 93 S.Ct. 253 (emphasis added). When the steps of the claim “must be taken in order to apply the [abstract idea] in question,” the claim is essentially no different from saying apply the abstract idea. Prometheus, 132 S.Ct. at 1299-1300. It is not the breadth or narrowness of the abstract idea that is relevant, but whether the claim covers every practical application of that abstract idea.[3]
And, we know that, even if a claim does not wholly pre-empt an abstract idea, it still will not be limited meaningfully if it contains only insignificant or token pre- or post-solution activity—such as identifying a relevant audience, a category of use, field *1301 of use, or technological environment. See Prometheus, 132 S.Ct. at 1297-98, 1300-01; Bilski, 130 S.Ct. at 3230-31; Diehr, 450 U.S. at 191-92 & n. 14, 101 S.Ct. 1048; Parker v. Flook, 437 U.S. 584, 595 n. 18, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978).
Finally, the Supreme Court has told us that a claim is not meaningfully limited if its purported limitations provide no real direction, cover all possible ways to achieve the provided result, or are overly-generalized. See Prometheus, 132 S.Ct. at 1300 (“[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable.”); Fort Props., 671 F.3d at 1323 (“Such a broad and general limitation does not impose meaningful limits on the claim’s scope.” (internal quotation marks omitted)). For example, in Prometheus, “the ‘determining’ step tells the doctor to determine the level of the relevant metabolites in the blood, through whatever process the doctor or the laboratory wishes to use.” 132 S.Ct. at 1297. Diehr explained that the application in Flook “did not purport to explain how these other variables were to be determined, nor did it purport to contain any disclosure relating to the chemical processes at work, the monitoring of process variables, or the means of setting off an alarm or adjusting an alarm system,” and that “[a]ll that it provides is a formula for computing an updated alarm limit.” Diehr, 450 U.S. at 186-87, 101 S.Ct. 1048 (footnote omitted) (internal quotation marks omitted).
Just as the Supreme Court has told us when a claim likely should not be deemed meaningfully limited, it has also given us examples of. meaningful limitations which likely remove claims from the scope of the Court’s judicially created exceptions to Section 101. Thus, a claim is meaningfully limited if it requires a particular machine implementing a process or a particular transformation of matter. See Bilski 130 S.Ct. at 3227 (“This Court’s precedents establish that the machine-or-transformation test is a useful and important clue ... for determining whether some claimed inventions are processes under § 101.”); see also Prometheus, 132 S.Ct. at 1302-03; Diehr, 450 U.S. at 184, 192, 101 S.Ct. 1048. A claim also will be limited meaningfully when, in addition to the abstract idea, the claim recites added limitations which are essential to the invention. In those instances, the added limitations do more than recite pre- or post-solution activity, they are central to the solution itself. And, in such - circumstances, the abstract idea is not wholly pre-empted; it is only preempted when practiced in conjunction with the other necessary elements of the claimed invention. See Diehr, 450 U.S. at 187, 101 S.Ct. 1048 (“[T]he respondents here do not seek to patent a mathematical formula. Instead, they seek patent protection for a process of curing synthetic rubber. Their process admittedly employs a well-known mathematical equation, but they do not seek to pre-empt the use of that equation. Rather, they seek only to foreclose from others the use of that equation in conjunction with all of the other steps in their claimed process.”); see also Prometheus, 132 S.Ct. at 1298-99 (discussing Diehr, 450 U.S. 175, 101 S.Ct. 1048).[4]
*1302 3. Computer-specific limitations
When assessing computer implemented claims, while the mere reference to a general purpose computer will not save a method claim from being deemed too abstract to be patent eligible, the fact that a claim is limited by a tie to a computer is an important indication of patent eligibility. See Bilski, 130 S.Ct. at 3227. This is true both because its tie to a machine moves it farther away from a claim to no more than an idea and because that same tie makes it less likely that the claims will pre-empt all practical applications of the idea.
The key to this inquiry is whether the claims tie the otherwise abstract idea to a specific way of doing something with a computer, or a specific computer for doing something; if so, they likely will be patent eligible, unlike claims directed to nothing more than the idea of doing that thing on a computer. While no particular type of limitation is necessary, meaningful limitations may include the computer being part of the solution, being integral to the performance of the method, or containing an improvement in computer technology. See SiRF Tech., Inc. v. Int’l Trade Comm’n, 601 F.3d 1319, 1332-33 (Fed.Cir.2010) (noting that “a machine,” a GPS receiver, was “integral to each of the claims at issue” and “place[d] a meaningful limit on the scope of the claims”). A special purpose computer, i.e., a new machine, specially designed to implement a process may be sufficient. See Alappat, 33 F.3d at 1544 (“Although many, or arguably even all, of the means elements recited in claim 15 represent circuitry elements that perform mathematical calculations, which is essentially true of all digital electrical circuits, the claimed invention as a whole is directed to a combination of interrelated elements which combine to form a machine for converting discrete waveform data samples into anti-aliased pixel illumination intensity data to be displayed on a display means. This is not a disembodied mathematical concept which may be characterized as an ‘abstract idea,’ but rather a specific machine to produce a useful, concrete, and tangible result.” (footnotes omitted)); see also id. at 1545 (“We have held that such programming creates a new machine, because a general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software.”).
At bottom, where the claim is tied to a computer in such a way that the computer plays a meaningful role in the performance of the claimed invention, and the claim does not pre-empt virtually all uses of an underlying abstract idea, the claim is patent eligible.
B. What the Exception Is Not About
In specifying what the scope of the abstract idea exception to patent eligibility is, it is also important to specify what the analysis is not. Flook suggested that an abstract idea is to be “treated as though it were a familiar part of the prior art.” 437 U.S. at 592, 98 S.Ct. 2522. Prometheus used the language of “inventive concept” to describe the “other elements or a combination of elements ... sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself’ and described purported limitations as “routine” or “conventional.” 132 S.Ct. at 1294, 1298-99. Such language should not be read to conflate principles of patent eligibility with those of validity, however. Nor should it be read to instill an “inventiveness” or “ingenuity” component into the inquiry.
The eligibility inquiry is not an inquiry into obviousness, novelty, enablement, or any other patent law concept. Each section plays a different role and no one section is more important than any other. *1303 Section 112 of Title 35 protects the public by ensuring that patents fully disclose, enable, and particularly claim the invention. Sections 102 and 103 ensure that the public is free to use what was previously known and the obvious variants thereof. The Section 101 eligibility inquiry determines whether a claim is limited meaningfully to permissible subject matter, as distinct from the validity requirements of the other sections.
The Supreme Court repeatedly has cautioned against conflating the analysis of the conditions of patentability in the Patent Act with inquiries into patent eligibility. See Diehr, 450 U.S. at 190, 101 S.Ct. 1048 (“The question therefore of whether a particular invention is novel is wholly apart from whether the invention falls into a category of statutory subject matter.” (internal quotation marks omitted)); see also Prometheus, 132 S.Ct. at 1304 (recognizing that “to shift the patent-eligibility inquiry entirely to [§§ 102, 103, and 112] risks creating significantly greater legal uncertainty, while assuming that those sections can do work that they are not equipped to do”). Because a new combination of old steps is patentable, as is a new process using an old machine or composition, subject matter eligibility must exist even if it was obvious to use the old steps with the new machine or composition. Otherwise the eligibility analysis ignores the text of sections 101 and 100(b), and reads Section 103 out of the Patent Act.
The Supreme Court’s reference to “inventiveness” in Prometheus must be read as shorthand for its inquiry into whether implementing the abstract idea in the context of the claimed invention inherently requires the recited steps. Thus, in Prometheus, the Supreme Court recognized that the additional steps were those that anyone wanting to use the natural law would necessarily use. See Prometheus, 132 S.Ct. at 1298. If, to implement the abstract concept, one must perform the additional step, then the step merely separately restates an element of the abstract idea, and thus does not further limit the abstract concept to a practical application.[5]
C. Nature of Our Inquiry
Because we are assessing judicially created exceptions to a broad statutory grant, one of the principles that must guide our inquiry is that judge-made exceptions to properly enacted statutes are to be narrowly construed. Indeed, the Supreme Court has cautioned that, to avoid improper narrowing by courts of congressional enactments, resort to judge-made exceptions to statutory grants must be rare. See, e.g., W. Union Tel. Co. v. Lenroot, 323 U.S. 490, 514, 65 S.Ct. 335, 89 L.Ed. 414 (1945) (“[T]he judicial function does not allow us to disregard that which Congress has plainly and constitutionally decreed and to formulate exceptions which we think, for practical reasons, Congress might have made had it thought more about the problem.”); United States v. Rutherford, 442 U.S. 544, 559, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979) (“Whether, as a policy matter, an exemption should be created is a question for legislative judgment, not judicial inference.”).
*1304 Congress drafted Section 101 broadly and clearly, and anything beyond a narrow exception would be impermissibly in tension with the statute’s plain language and design. See Chakrabarty, 447 U.S. at 308, 100 S.Ct. 2204 (“In choosing such expansive terms as ‘manufacture’ and ‘composition of matter,’ modified by the comprehensive ‘any,’ Congress plainly contemplated that the patent laws would be given wide scope.”); id. at 315, 100 S.Ct. 2204 (“Broad general language is not necessarily ambiguous when congressional objectives require broad terms.”); cf. Bilski, 130 S.Ct. at 3226 (“This Court has not indicated that the existence of these well-established exceptions gives the Judiciary carte blanche to impose other limitations that are inconsistent with the text and the statute’s purpose and design.”). As the Supreme Court has made clear, too broad an interpretation of these exclusions from the statutory grant of Section 101 “could eviscerate patent law.” Prometheus, 132 S.Ct. at 1293. It is particularly important that Section 101 not be read restrictively to exclude “unanticipated inventions” because the most beneficial inventions are “often unforeseeable.” See Chakrabarty, 447 U.S. at 316, 100 S.Ct. 2204; see also J.E.M. Ag Supply, 534 U.S. at 135, 122 S.Ct. 593 (describing Section 101 as “a dynamic provision designed to encompass new and unforeseen inventions.”). Broad inclusivity is the Congressional goal of Section 101, not a flaw. Judicially created exceptions must not be permitted to thwart that goal.
Mindful of these admonitions, we turn to CLS Bank’s contention that the presumption of validity should not apply to patent eligibility challenges. CLS Bank contends that the presumption of validity only applies to statutory bases for invalidating a patent—35 U.S.C. Sections 102, 103, 112, and 251. Thus, although the Supreme Court invalidated the patent before it in Prometheus because it fell within one of the exceptions to patent eligibility—the law of nature exception—CLS Bank contends that the Section 101 inquiry does not involve the presumption of validity in the same way the statutory bases for invalidity do. We disagree.[6]
Before issuing a patent, the Patent Office rejects claims if they are drawn to ineligible subject matter, just as it rejects claims if not compliant with Sections 102, 103, or 112. Thus, when a patent issues, it does so after the Patent Office assesses and endorses its eligibility under Section 101, just as it assesses and endorses its patentability under the other provisions of Title 35. See Microsoft Corp. v. i4i Ltd. P’ship, — U.S. -, 131 S.Ct. 2238, 2242, 180 L.Ed.2d 131 (2011) (“Congress has set forth the prerequisites for issuance of a patent, which the PTO must evaluate in the examination process. To receive patent protection a claimed invention must, among other things, fall within one of the express categories of patentable subject matter, § 101, and be novel, § 102, and nonobvious, § 103.”). We see no reason not to apply the same presumption of validity to that determination as we do to the Patent Office’s other patentability determinations.
Because we believe the presumption of validity applies to all challenges to patent-ability, including those under Section 101 and the exceptions thereto, we find that any attack on an issued patent based on a challenge to the eligibility of the subject *1305 matter must be proven by clear and convincing evidence. Cf. Microsoft, 131 S.Ct. at 2242 (“We consider whether § 282 requires an invalidity defense to be proved by clear and convincing evidence. We hold that it does.”). We believe, moreover, that application of this presumption and its attendant evidentiary burden is consistent with the Supreme Court’s admonition to cabin the judicially created exceptions to Section 101 discussed above.
With these principles in mind, we turn to the specific claims here. We start with the system claims, which all four of us agree are patent-eligible.
IV
At the outset, a computer-implemented invention is eligible for patenting under Section 101. Computers are “machines.” Machines are expressly eligible subject matter under Section 101. Having said that, however, were it not for software, programmable computers would be useless. A computer without software collects dust, not data. The operation of the software changes the computer, altering its ability to perform one function or another as the software indicates. This court long ago recognized that a computer programmed to perform a specific function is a new machine with individualized circuitry created and used by the operation of the software. See Alappat, 33 F.3d at 1545. The combination of machine and software “creates a new machine, because a general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software.” Id.; see Morse, 56 U.S. (15 How.) at 113 (“[H]e says he does not confine his claim to the machinery or parts of machinery, which he specifies.... ”); cf. Bilski, 130 S.Ct. at 3227 (an important clue that a claim embracing an abstract idea is patent eligible is if its use is tied to a machine).
The combination of new software and a computer machine accomplishes wonders by reducing difficult processes—like determining where someone is on the earth, instantly translating Chinese to English, or performing hundreds of functions in a hand-held device called a “smart phone”— into a series of simple steps. For example, the Supreme Court upheld precisely this kind of combination for the computer-implemented parameters to,run a rubber press—breaking the known steps into tiny mathematical calculations that advanced a known function beyond prior capabilities. See Diehr, 450 U.S. at 179, 101 S.Ct. 1048. Indeed, much of the innovative energy and investment of the past few decades have focused on software improvements that have produced revolutions in modern life, including the “smart phone.”
Nonetheless we must examine whether, despite falling within the plain language of Section 101, clear and convincing evidence shows that a claim to a computer-implemented invention is barred from patent eligibility by reason of the narrow judicial prohibition against claiming an abstract idea. In Bilski the Court analyzed whether, and under what circumstances, a method claim’s tie to a machine could make it a practical application of the underlying idea, and thus patent-eligible. The Court explained that a machine tie, though not required, is a “useful and important clue” that a method claim is patent-eligible. Bilski, 130 S.Ct. at 3227. If'tying a method to a machine can be an important indication of patent-eligibility, it would seem that a claim embodying the machine itself, with all its structural and functional limitations, would rarely, if ever, be an abstract idea. Cf. Diehr, 450 U.S. at 187, 101 S.Ct. 1048.
*1306 ■ Indeed, in theory, an inventor could claim a machine combination with circuitry, transistors, capacitors, and other tangible electronic components precisely arrayed to accomplish the function of translating Chinese to English. These complex interrelated machine components would squarely fit within the terms of Section 101 and involve nothing theoretical, highly generalized, or otherwise abstract. The fact that innovation has allowed these machines to move from vacuum-tube-filled specialized mechanical behemoths, to generalized machines changed by punch cards, to electronically programmable machines that can fit in the palm of your hand, does not render them abstract.[7]
Analyzing each asserted system claim as a whole, as we are required to do, demonstrates that each does not claim anything abstract in its machine embodiments. Especially in light of the fact that this appeal involves summary judgment of invalidity, and so requires clear and convincing evidence of invalidity, for the following reasons we would reverse the district court.
V
Claim 26 of the '375 Patent is typical of Alice’s system claims and recites:
A data processing system to enable the exchange of an obligation between parties, the system comprising:

a communications controller,

a first party device, coupled to said communications controller,
a data storage unit having stored therein
(a) information about a first account for a first party, independent from a second account maintained by a first exchange institution, and
(b) information about a third account for a second party, independent from a fourth account maintained by a second exchange institution; and

a computer, coupled to said data storage unit and said communications controller, that is configured to

(a) receive a transaction from said first party device via said communications controller;
(b) electronically adjust said first account and said third account in order to effect an exchange obligation arising from said transaction between said first party and said second party after ensuring that said first party and/or said second party have adequate value in said first account and/or said third account, respectively; and
(c) generate an instruction to said first exchange institution and/or said second exchange institution to adjust said second account and/or said fourth account in accordance with the adjustment of said first account and/or said third account, wherein said instruction being an irrevocable, time invariant obli *1307 gation placed on said first exchange institution and/or said second exchange institution.
'375 Patent claim 26 (emphases added).
Even viewed generally, the claim covers the use of a computer and other hardware specifically programmed to solve a complex problem. Specifically, the claimed data processing system is limited to an implementation of the invention that includes at least four separate structural components: a computer, a first party device, a data storage unit, and a communications controller coupled via machine components to the computer and the first party device. The claim further limits the system by requiring a structural configuration that “receivefs],” “electronically adjust[s],” and “generated” according to the specific requirements of the system. These are traditional hardware claims and the '375 Patent discloses at least thirty-two figures which provide detailed algorithms for the software with which this hardware is to be programmed.
Lest it be said that these structural and functional limitations are mere conventional post-solution activity that is not integral to the performance of the claimed system, the specification explains implementation of the recited special purpose computer system. It states, for example, that the “core of the system hardware is a collection of data processing units.” '375 Patent col. 7 11. 22-23. Each processing unit “is operably connected with ... one or more mass data storage units ... to store all data received from stakeholders, and other data relating to all other software operations generating or retrieving stored information.” Id. col. 7 11. 39-43. The specification also explains that the communications controllers “effect communications between the processing units ... and the various external hardware devices used by the stakeholders to communicate data or instructions to or from the processing units.” Id. col. 7 11. 46-52. The computer can connect to the communications controller by means of another machine, a modem. Id. col. 711. 57-60.
The specification also includes numerous flowcharts that provide algorithm support for the functions recited in the claims. Each processor in the claimed system runs applications software that is written to implement the algorithms in Figures 8 to 16 and 18 to 40. See id. col. 7 11. 26-31. As just one example, the system performs the algorithm depicted in Figure 16 (shown below) to confirm that parties are able to exchange obligations (“matched order confirmation”). See, e.g., id. col. 20 1.54-col. 211.18.
*1308 [[Image here]]
The specification states that the confirmation algorithm includes the step of “creating transactions in the payment shadow file.” Id. col. 20 11. 62-64. This step corresponds to blocks 1624 and 1625 in Figure 16. After creating these transactions, the system “checks that ‘consideration payment’ was effected successfully” (block 1626 in Figure 16), which requires determining whether the required consideration amount is available in the payment shadow file. Id. col. 20 1.64-col. 21 1.1. If there is
*1309 insufficient consideration, the matched order is rejected (block 1627). Id. col. 21 11. 1-4. This portion of the specification thus provides algorithm support for the “electronically adjust” element of claim 26, in which the system adjusts accounts “after ensuring that said first party and/or said second party have adequate value in” their accounts. Id. claim 26.
Labeling this system claim an “abstract concept” wrenches all meaning from those words, and turns a narrow exception into one which may swallow the expansive rule (and with it.much of the investment and innovation in software). Nor is claim 26 even the narrowest, most detailed claim on appeal. The patents at issue contain dependent claims which include additional structural and functional limitations that render the system even more concrete. Claim 36, for example, further comprises “means for allowing said first party to acquire an item from said second party, wherein the exchange obligation relates to said item.” This means-plus-function element is limited to the specific algorithms that the specification teaches as performing the recited function. Dependent claim 37 limits the data processing system to one that “further compris[es] a second party device, wherein said computer is further configured to receive a transaction from said second party device via said communications controller.” This adds a fifth structure, the second party device, to the required system.
The '720 Patent’s claims recite similar structure and programming. The claims recite a data processing system comprising a data storage unit coupled to a computer. See, e.g., '720 Patent claim 1. The computer is configured (programmed) to perform the “receive,” “electronically adjust,” and “generate” functions. Id. Certain dependent claims add additional structural and functional limitations that show even more clearly that the claims are directed to a concrete and practical application of any underlying idea. Claims 27, 59, 67, 79, and 84, for example, limit the system to one with “means for allowing said first party to acquire an item from said second party.” The specific structure and functions recited in these claims, which are integral to performing the invention, show that the '720 Patent’s claims are directed to practical applications of the underlying idea and thus are patent-eligible.
The claims do not claim only an abstract concept without limitations that tie it to a practical application. Confirming this, someone can use an escrow arrangement in many other applications, without computer systems, and even with computers but in other ways without infringing the claims. See Appellant’s En Bane Resp. Br. 40. Nor is this simply a case where a claim has been limited to a particular field.' Cf. Bilski, 130 S.Ct. at 3231. Indeed, because they require a machine, the claims cannot be infringed even in this field, and even if a human performs the claimed steps through a combination of physical or mental steps. It would be improper for the court to ignore these limitations and instead attempt to identify some “gist” or “heart” of the invention. See Diehr, 450 U.S. at 188, 101 S.Ct. 1048 (it is improper to dissect the claims; they must be considered as a whole); Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 345, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) (“[Tjhere is no legally recognizable or protected ‘essential’ element, ‘gist’ or ‘heart’ of the invention.”).
We next test the additional elements in addition to any abstract idea of an escrow present in the claim. The recited steps are not inherent in the process of using an escrow. One can conduct an escrow without a data processing system that includes a data storage unit coupled to a computer which has been modified by software to *1310 receive transactions, adjust records, and generate electronic instructions according to specific structural limitations in both software and hardware formats. These structural elements are additional steps to an escrow, not inherent in it.
Further, we detect no clear and convincing evidence in this record that as of the critical time the steps recited were used commonly in computer implemented prior art practicing the abstract concept implicated here. As explained above, whether the additional steps were routine in some other context is not the inquiry: a combination of old processes is patent eligible subject matter. 35 U.S.C. § 100(b). As discussed above, nonobviousness is not an issue under Section 101; neither is “invention.” Instead, the question is whether these steps are inherent in an escrow. . This record contains no clear and convincing evidence to that effect. Instead, much of the information relied upon by CLS Bank is not even “prior art,” especially given that some claims may have priority to the early 1990’s. See Respondent’s Br. at 28. A use of a computer is not inherent in an escrow, and the record gives no reason to conclude that use of machines in the specific claimed system would “involve well-understood, routine, conventional activity previously engaged in by researchers in the field.” Prometheus, 132 S.Ct. at 1294. Rapid changes in computer and telecommunication technology occurred in the early 1990’s. While apparently routine at the present time to use computers to perform instantaneous international financial transactions, this court will not engage in the hindsight error of speculating about the state of that technology over twenty years ago.
Finally, these limitations are not stated at a high level of generality. These system limitations do not recite only using the steps of an escrow as applied to a particular field of commerce. Because of the number and specificity of the structural limitations, these claims have narrow, if any, relevant pre-emptive effect. Under Section 101, even a process made up of old processes is patent eligible; so too must be a new machine made to perform even old processes.
The claims here are analogous to those found patent eligible in Diehr. The claims related to a method that used a machine, an abstract idea, and other steps to cure rubber. See Diehr, 450 U.S. at 179 n. 5, 101 S.Ct. 1048. The examiner rejected the claims because he deemed the additional steps were “conventional and necessary to the process.” Id. at 180-81, 101 S.Ct. 1048 (internal quotation marks omitted). Those steps included steps that sound utterly old and routine: “heating said mold,” “comparing” data, “constantly determining the temperature of the mold,” “repetitively calculating,” and “opening the press.” Id. at 179 n. 5, 101 S.Ct. 1048. Indeed, even the Arrhenius equation was well-known in the art, but in combination was eligible. ,
The Supreme Court acknowledged these fact findings about the known status of various elements of the claim in Diehr, but it nonetheless reversed. It stated that the claims were patent eligible' because they were “drawn to an industrial process for the molding of rubber products.” Id. at 192-93, 101 S.Ct. 1048. In doing so, the Court explained that the claims “describe[d] a process of curing rubber beginning with the loading of the mold and ending with the opening of the press and the production of a synthetic rubber product.” Id. at 193 n. 15, 101 S.Ct. 1048. Indeed, the computer system supplied the speed, accuracy, reliability, and automaticity that enhanced and applied the known rubber molding process and formulae. Moreover, as the Supreme Court also explained in Bilski, a method linked to a machine exhibits a “useful and important *1311 clue” that even the process alone (let alone a system claim that expressly recites complex machine combinations) is patent-eligible. Bilski 130 S.Ct. at 3227.
Here, the claim recites a machine and other steps to enable transactions. The claim begins with the machine acquiring data and ends with the machine exchanging financial instructions with other machines. The “abstract idea” present here is not disembodied at all, but is instead integrated into a system utilizing machines. In sum, the system claims are indistinguishable from those in Diehr. For these reasons, the system claims are not directed to patent ineligible subject matter. We would therefore reverse the summary judgment of invalidity for ineligibility of the system claims and remand them for further consideration.
VI
Claim 33 of the '479 Patent is representative of the method claims and recites:
A method of exchanging obligations as between parties, each party holding a credit record and a debit record with an exchange institution, the credit records and debit records for exchange of predetermined obligations, the method comprising the steps of:
(a) creating a shadow credit record and a shadow debit record for each stakeholder party to be held independently by a supervisory institution from the exchange institutions;
(b) obtaining from each exchange institution a start-of-day balance for each shadow credit record and shadow debit record;
(c) for every transaction resulting in an exchange obligation, the supervisory institution adjusting each respective party’s shadow credit record or shadow debit record, allowing only these [sic] transactions that do not result in the value of the shadow debit record being less than the value of the shadow credit record at any time, each said adjustment taking place in chronological order; and
(d)at the end-of-day, the supervisory institution instructing one of the exchange institutions to exchange credits or debits to the credit record and debit record of the respective parties in accordance with the adjustments of the said permitted transactions, the credits and debits being irrevocable, time invariant obligations placed on the exchange institutions.
'479 Patent col. 65 11. 23-50. Alice concedes that claims 39 to 41 of the '375 Patent rise or fall with the method claims, and so we will not separately analyze them. Petitioner’s Br. 50 n. 3.
At the outset, the invention claims a “process.” By definition, a process is statutory subject matter under Section 101— whether or not the recited elements are “old.” 35 U.S.C. § 100(b). Thus, the inquiry shifts to seek clear and convincing evidence that the claim, nonetheless, is ineligible for patenting because it falls within one of the judicial exceptions. Here, the question asks whether the claim is abstract.
The claim describes the general and theoretical concept of using a neutral intermediary in exchange transactions to-reduce risk that one party will not honor the deal, i.e., an escrow arrangement. The record in this case shows that this area of art has used the fundamental concept of an intermediary in this context for centuries, if not longer. See Petitioners’ Br. 36. Thus, this claim embodies elements of abstractness which propel this court into a further examination of its eligibility. Obviously, the claim does not simply state “use an escrow.” Consequently, we must determine whether the recited steps are inherent in an escrow and claimed at a high *1312 level of generality, such that in fact the claim is not to a practical application of the concept of an escrow, but in effect claims the abstract concept of an escrow. If this claim exhibits those infirmities, it is likely to also exhibit a broad pre-emptive effect. Thus, we turn to the additional limitations.
The first claimed step involves creating shadow credit and debit records for the parties to the transaction. This highly generalized step is nothing but a recitation of a step inherent in the concept of an escrow.. Further, the record again shows that bookkeepers have long kept track of accounts in this fashion as a basic form of bookkeeping. Appellant’s Br. 39 (citing Richard A. Brown, A History of Accounting and Accountants 93 (1905)). The step is not just predominant in the prior art, but an inherent part of any escrow arrangement.
The second claimed step involves obtaining the values for the previously created accounts to allow for their later manipulation. This generalized step is also inherent in the concept of an escrow. To determine the credit to one party and the debit to the other requires a starting place for the adjustments. Cf. Bilski, 130 S.Ct. at 3231 (holding claim not directed to patent-eligible subject matter because establishing “inputs” for the equation required done according to well-known techniques). This step only recites another inherent feature of an escrow. Similarly, the third step involves adjusting the account balances to reflect the parties’ trading activity. The fourth step likewise adds nothing beyond the well-known procedures used in the concept of an escrow: an instruction to pay or deduct funds is made. Again, the record shows that an intermediary cannot perform an escrow arrangement without either paying or ordering someone to pay the proper amounts.
Thus, each step individually recites merely a general step inherent within the
concept of an escrow, using a third party intermediary in this fashion. While the claim certainly limits use of an escrow to the context of this particular field, that attempted limitation is not enough. Cf. Bilski, 130 S.Ct. at 3231 (stating that “limiting an abstract idea to one field of use or adding token post-solution components did not make the concept patentable”); see Flook, 437 U.S. at 586, 98 S.Ct. 2522 (explaining that other steps in the process did not limit the claim to a particular application, even though they applied generally to hydrocarbon conversion processes).
Finally, we note that the method claims do not mention a computer. CLS Bank, 768 F.Supp.2d at 236. Even so, the district court assumed “the single fact” that the “method claims are implemented by computer....” Id. Putting to the side whether this construction was correct, see Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed.Cir.2005) (en banc) (courts generally should not read limitations from the specification into a claim), even assuming the method claims require use of a computer in some unspecified way, this implicit reference to computer “implementation” is not, by itself, enough.
To sum up, the claim as a whole embraces using an escrow to avoid risk of one party’s inability to pay—an abstract concept. Viewed as a whole, the claim is indistinguishable from the claim in Bilski, 130 S.Ct. at 3231. Viewed individually, the recited elements only recite the steps inherent in that concept (stated at a high level of generality) and implement those steps according to methods long used in escrows according to the record in this case. As explained, the attempt to limit the escrow concept to a particular field is not sufficient. See id. Thus, like Judge Lourie, we would hold the method claims in this case are not eligible under Section *1313 101, but would do so for different reasons than he articulates.
VII
For the reasons stated above, Chief Judge Rader and Judges Linn, Moore, and O’Malley would reverse the district court’s determination that the system claims address subject matter that is not patent eligible. Chief Judge Rader and Judge Moore, however, would affirm the district court’s conclusion that the method and media claims are patent ineligible. Chief Judge Rader and Judge Moore, thus, dissent in part and concur in part in the judgment the court enters today.
Judges Linn and O’Malley believe that, if the method claims could be interpreted as in part VI, they would be patent ineligible. But, for the reasons stated in their separate opinion, they believe that, as properly construed on this record and in this procedural posture, the method claims are patent eligible. Accordingly, they dissent from all aspects of the judgment the court enters today.
With these results in mind, all four of us would remand for further consideration of the conditions and requirements of the Patent Act and further proceedings, as appropriate.
Dissenting-in-part opinion filed by MOORE, Circuit Judge, in which RADER, Chief Judge, and LINN and O’MALLEY, Circuit Judges, join.

. No portion of any opinion issued today other than our Per Curiam Judgment garners a majority. The court is evenly split on the patent eligibility of the system claims.. Although a majority of the judges on the court agree that the method claims do not recite patent eligible subject matter, no majority of those judges agrees as to the legal rationale for that conclusion. Accordingly, though much is published today discussing the proper approach to the patent eligibility inquiry, nothing said today beyond our judgment has the weight of precedent.

. P.J. Federico, one of the 1952 Patent Act's "principal authors,” was also a chief patent examiner. Hodosh v. Block Drug Co., 833 F.2d 1575, 1578 (Fed.Cir.1987). Federico’s Commentary constitutes "an invaluable insight into the intentions of the drafters of the Act.” Symbol Techs., Inc. v. Lemelson Med., 277 F.3d 1361, 1366 (Fed.Cir.2002); see also George M. Sirilla & Hon. Giles S. Rich, 35 U.S.C.... 103: From Hotchkiss to Hand to Rich, the Obvious Patent Law Hall-of-Famers, 32 J. Marshall L.Rev. 437, 509 (1999) (discussing Federico’s and Judge Rich’s role as the drafters of the 1952 Act).

. The pre-emption analysis must also recognize that the Patent Act does not halt or impede academic research, without commercial ends, to test, confirm, or improve a patented invention. See Sawin v. Guild, 21 F. Cas. 554, 555 (C.C.D.Mass.1813) (No. 12,391) (Story, J.) (infringement does not occur when the invention is used "for the mere purpose of philosophical experiment, or to ascertain the verity and exactness of the specification”).

. Judge Lourie’s opinion concludes that the system claims are not patent eligible in part because it is now routine for computers to perform the functions described—because the world has changed, as the opinion puts it. Lourie Op. at 1291-92. Using what has become routine in 2013 to determine what was inherent in a concept in the early 1990s injects hindsight into the eligibility analysis and fails to recognize that patent eligibility, like all statutory patentability questions, is to be measured as of the filing date. See, e.g., 35 U.S.C. §§ 102, 103.

. Judge Lourie’s opinion takes the reference to an "inventive concept” in Prometheus and imbues it with a life that is neither consistent with the Patent Act's description of Section 101 nor with the totality of Supreme Court precedent regarding the narrow exceptions thereto. He concludes that "inventive concept” must refer to a “genuine human contribution to the claimed subject matter.” Lourie Op. at 1283. He, thus, injects an "ingenuity” requirement into the abstract exception inquiry. It is inconceivable to us that the Supreme Court would choose to undo so much of what Congress tried to accomplish in the 1952 Patent Act, and to do so by the use of one phrase in one opinion.

. In its reply brief, CLS Bank intimates that the presumption of validity does not apply because a challenge to patent eligibility is not a listed defense to infringement under 35 U.S.C. § 282(b). This issue, however, was not fully briefed by the parties and, accordingly, we do not address it.

. We must disagree with Judge Lourie that a computer must do something other than what a computer does before it may be considered a patent-eligible invention. See Lourie Op. at 1286 ("At its most basic, a computer is just a calculator capable of performing mental steps faster than a human could. Unless the claims require a computer to perform operations that are not merely accelerated calculations, a computer does not itself confer patent eligibility.”). Everything done by a computer can be done by a human. Requiring a computer to do something that a human could not would mean that computer implementation could never produce patent eligibility. If a computer can do what a human can in a better, specifically limited way, it could be patent eligible. Indeed, even an increase in speed alone may be sufficient to result in a meaningful limitation; if a computer can perform a process that would take a human an entire lifetime, a claim covering that solution should be sufficiently limited to be patent eligible.